THE LONG ISLAND SAVINGS BANK, FSB, and The Long Island Savings Bank of Centereach FSB, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 92–517–C.

United States Court of Federal Claims.

Sept. 15, 2005.

Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy LLP, Washington, D.C., for plaintiffs. With him at trial and on briefs were William E. Wallace III, David S. Co-

hen, and Andrew M. Leblanc, Milbank, Tweed, Hadley & McCloy LLP.

Jerome A. Madden, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant, with whom were Deputy Assistant Attorney General Stuart E. Schiffer, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, and, at trial as well as on briefs, Timothy J. Abraham, Cheryl L. Evans, Elizabeth A. Holt, Jeffrey T. Infelise, Brian L. Owsley, John H. Roberson, and Lee M. Straus, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

## INTRODUCTION

Both liability and damages remain unresolved in this *Winstar*-related case.[1] Plaintiffs are federal savings banks or "thrifts" which allege that the government breached a contract entered in 1983 involving the treatment of goodwill as regulatory capital and that plaintiffs suffered expectancy and reliance damages as a result of the breach. To adjudicate the disputed issues of fact, the court conducted a 24-day trial commencing on January 18, 2005 and ending on March 23, 2005. Post-trial briefs were filed thereafter, and a closing argument was held on July 7, 2005. The case is now ready for disposition.[2]

For the reasons set out below, the court finds that the government entered into a contract with plaintiffs providing for, among other things, the recognition of goodwill amounting to approximately $625.4 million in connection with the acquisition by plaintiff The Long Island Savings Bank, FSB ("Syosset") of The Long Island Savings Bank of Centereach FSB ("Centereach") from the Federal Savings and Loan Insurance Corporation ("FSLIC") with the participation of the Federal Home Loan Bank Board ("FHLBB" or "Bank Board"). The contract also provided for the use of push-down accounting regarding the acquisition, for the treatment of the goodwill as regulatory capital, and for the amortization of the goodwill over a period of forty years. The court additionally finds that this contract was breached by the government upon the enactment on August 9, 1989 of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), and the adoption of implementing regulations on November 8, 1989, to be effective December 7, 1989, by the Office of Thrift Supervision ("OTS"), the successor of the Bank Board under FIRREA.[3] The court further finds that plaintiffs are entitled to damages caused by the breach in the amount of $435,755,000.

## FACTS [4]

### Syosset

Syosset was a conservatively run, "plain vanilla" bank with branches on Long Island, in Queens, Nassau, and Suffolk counties. Tr. 3913:23 to 3914:1, 3917:10–16 (Test. of James J. Conway, Jr., Syosset's chairman of the board of directors and chief executive offi-

---

**1.** See United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

**2.** Previously, Senior Judge Margolis granted a motion by plaintiffs for summary judgment on defendant's counterclaims and affirmative defenses. Long Island Sav. Bank v. United States, 54 Fed.Cl. 607 (2002). Subsequently, this court denied cross-motions for summary judgment on damages, except that the court held that plaintiffs as a matter of law were not entitled to pursue certain damage theories, including among other things, that they could not recover as a component of expectancy damages the cost of replacing $1.06 billion of deposits lost due to branch sales that occurred in mitigating the loss of goodwill as regulatory capital and that plain-

tiffs could not seek restitution as a remedy where they continued in operation. Long Island Sav. Bank v. United States, 60 Fed.Cl. 80, 96–97 (2004).

**3.** FIRREA also abolished FSLIC and transferred its insurance functions to the Federal Deposit Insurance Corporation ("FDIC"). See Winstar, 518 U.S. at 856, 116 S.Ct. 2432.

**4.** This recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

cer); Tr. 66:11–14 (Test. of Mark Fuster, at various times Syosset's senior vice president, treasurer, and chief financial officer); Tr. 981:2–8 (Test. of William E. Viklund, Syosset's president and chief operating officer). Syosset was organized as a New York State chartered mutual savings bank in 1876 and had converted to a federal mutual savings bank in December 1982. DX606 at WOQ 632 1702 (Prospectus by Long Island Savings Bank, FSB (Feb. 14, 1994)). Early in the 1980s, Syosset was a healthy thrift that had twelve branches, roughly $950 million to $1 billion in assets, and a tangible net worth of approximately 8% of those assets, or $80 million. Tr. 981:9–22 (Test. of Viklund). Syosset's management realized that it would have to grow to remain competitive and to address the marketing and technological changes that were occurring in the banking industry following considerable deregulation. Tr. 982:7–16 (Test. of Viklund).

The FDIC's Creation of Suffolk Phoenix

In 1979, two other sizeable thrifts on Long Island, County Federal Savings and Loan Corporation ("County") and Suffolk County Federal Savings and Loan Association ("Old Suffolk"), began incurring significant operating losses. *See* PX 5 at 5–10 (Memo from Edward J. O'Connell, III, Regional Director, FHLBB, to J.J. Finn, Secretary to the Board, FHLBB (May 13, 1983)). County was almost as large as Syosset, and Old Suffolk was actually larger than Syosset. Tr. 66:5 to 67:13 (Test. of Fuster). County and Old Suffolk were merged in April 1982 under FSLIC's "Phoenix program,"[5] resulting in the creation of Suffolk County Federal Savings and Loan Association ("Suffolk Phoenix"). PX 5 at 1. In connection with this merger, Suffolk Phoenix received $62 million from FSLIC in the form of interest-bearing notes in exchange for income capital certificates ("ICCs") and net worth certificates ("NWCs"). PX 78 at LIP0017898 (Suffolk

Phoenix's Consolidated Financial Statements and Schedules (Dec. 31, 1982)). Suffolk Phoenix recorded on its books approximately $742 million of supervisory goodwill to be amortized over forty years on the straight-line method. *Id.*

Syosset's Acquisition of Suffolk Phoenix

In August 1982, Syosset, acting through its legal counsel, offered to acquire Suffolk Phoenix from FSLIC. *See* PX 67 (Letter from Douglas P. Faucette, Muldoon & Murphy, to H. Brent Beesley, Director, FSLIC (Aug. 31, 1982)). Syosset's offer letter proposed that it acquire Suffolk Phoenix through a direct merger in exchange for a capital contribution by FSLIC in the amount of $225 million. *Id.* at 1. In addition, Syosset conditioned its offer on the Bank Board's approval of Syosset's use of "the purchase method of accounting pursuant to the method generally accepted in the savings and loan industry on August 9, 1982 … [,] includ[ing] the straight line amortization of any goodwill created by such adjustment [of Syosset's assets] for a 40–year period." *Id.* at 2. By this language, Syosset sought to grandfather generally accepted accounting principles ("GAAP") as they existed prior to the Financial Accounting Standards Board's promulgation of Statement of Financial Accounting Standards No. 72 ("SFAS 72") in February 1983. *See* DX 1238 (SFAS 72); Tr. 94:22 to 97:11 (Test. of Fuster). As the Supreme Court explained in *Winstar,*

> SFAS 72 eliminated any doubt that the differential amortization periods on which acquiring thrifts relied to produce paper profits in supervisory mergers were inconsistent with GAAP. SFAS 72 also barred double counting of capital credits by requiring that financial assistance from regulatory authorities must be deducted from the cost of the acquisition before the amount of goodwill is determined.

---

**5.** FSLIC designed the Phoenix program to consolidate several failing or failed thrifts into a single association that would not only achieve efficiencies and receive close regulatory oversight, but would also receive significant assistance from the federal government. This assistance included direct monetary contributions, regulatory forbearances, and authoriza-

tion to use a purchase accounting system whereby assets and liabilities would be revalued at market price and the ensuing net liability would be recorded as an asset called 'supervisory goodwill' and accorded an extended amortization term. *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363, 1367 (Fed.Cir.2003).

*Winstar Corp.*, 518 U.S. at 855, 116 S.Ct. 2432 (citation omitted). Syosset's August 1982 proposal requested pre-SFAS 72 accounting treatment to set in place a permissible, favorable accounting option that would soon become obsolete. Although SFAS 72 was "applied prospectively to business combinations initiated after September 30, 1982[,] ... [r]etroactive application to a business combination initiated prior to October 1, 1982[wa]s permitted but not required." DX 1238 ¶ 15.

Syosset's offer letter further proposed that "[n]otwithstanding any change in generally accepted accounting principles o[r the] interpretation thereof, ... FHLBB shall permit LISB to report for any and all regulatory purposes as well as any reports published to its customers, creditors, depositors, security holders or the public, its financial condition and operations in accordance with the results of the [purchase method] adjustments described in the preceding sentence." PX 67 at 2. In that connection, Syosset requested from FSLIC an indemnification for any lost profits caused by a subsequent governmental decision to disallow use of the purchase method of accounting. *Id.* at 2–3. FSLIC did not respond to Syosset's August 1982 offer. Tr. 94:22 to 99:18 (Test. of Fuster); Tr. 996:18 to 1000:16 (Test. of Vicklund).

Subsequent to the merger between County and Old Suffolk, the financial condition of the resulting institution continued to decline. *See* PX 5 at 1–4 (Memo from O'Connell to Finn (May 13, 1983)). Consequently, in October 1982, the regulators undertook a national solicitation for potential acquirers of the Suffolk Phoenix and conducted a bidders' conference in December of that year. *Id.* at 11. Syosset attended that conference and submitted a proposal in January 1983, PX 3 (Letter from John R. Hall, Muldoon, Murphy, Bray & Faucette, to Angelo A. Vigna, Supervisory Agent, FHLBB (Jan. 20, 1983)), which proposal Syosset supplemented and amended in April of the same year. PX 4 (Letter from Hall to Beesley (Apr. 5, 1983)). The offer submitted in January contained two alternative bids, one proposing assistance from FSLIC in the form of capital certificates, and the other requesting a combination of capital certificates, cash, and subsidized borrowings. *See* PX 3. An amended proposal by Syosset in April 1983 contained only the latter bid; in these proposals, Syosset uniformly requested accounting treatment containing elements that had been put forward in its offer of August 1982, but in somewhat modified form. *See* PX 4; Tr. 110:14–22 (Test. of Fuster).

Syosset's overriding goal with respect to the proposed transaction was to protect itself from Suffolk Phoenix's tangible-capital deficit. Tr. 68:25 to 69:6, Tr. 72:3–14 (Test. of Fuster); PX 57, item (2) (list of items to consider for acquisition). Syosset's secondary goal was to secure its ability to use the resulting goodwill to stay in business, but not to grow. *See* Tr. 657:15 to 660:15 (Test. of Fuster); Tr. 1153:4 to 1155:18 (Test. of Viklund); Tr. 3915:10–23 (Test. of Conway); DX 1545 at 1 (Letter from James J. Nacos, the banks' executive vice president and secretary, to Stephen D. Rohrs, Assistant District Director, OTS (Jan. 31, 1991)). To achieve these goals, Syosset proposed that Suffolk Phoenix would convert to the stock form, and Syosset would acquire Suffolk Phoenix as a wholly-owned subsidiary, rather than by merger, for a purchase price of $100,000 in exchange for capital stock. PX 3 at 3–4; PX 4 at 2.[6] In addition, Syosset would maintain the subsidiary's net worth ratio at a minimum of one percent. PX 3 at 4; PX 4 at 2. Regarding the proposed accounting treatment, Syosset would be permitted to record goodwill "in accordance with the purchase method of accounting pursuant to the method generally accepted in the savings and loan industry on August 9, 1982," and "[s]uch method [would] include the straight line

---

6. The change in form of the transaction from a proposed merger to a proposed purchase of all of the stock of a subsidiary reflected in Syosset's August 1982 and January 1983 proposals, respectively, was due to the Bank Board's establishment on January 17, 1983 of a new method of accounting, known as "push-down" accounting, for thrifts entering into purchase transactions. Bank Board Memorandum R–55 permitted an acquirer to record, or "push-down," goodwill onto the books of the acquired association. *See* PX 8 (Memorandum R–55 (Jan. 17, 1983)); Tr. 102:16 to 105:2 (Test. of Fuster).

amortization of any goodwill created by such adjustment for a 40–year period ...." PX 3 at 4; PX 4 at 3. Syosset's bid further provided that "[n]otwithstanding any change in generally accepted accounting principles or interpretation thereof, ... the [Bank] Board shall permit Suffolk [Phoenix] and LISB to report for any and all regulatory purposes" in accordance with pre-SFAS 72 accounting treatment. PX 3 at 4; PX 4 at 3; Tr. 106:3 to 107:23 (Test. of Fuster).

Out of six bids received, FSLIC "determined that the bid of LISB [wa]s the most favorable." PX 5 at 11–12 (Memo from O'Connell to Finn (May 13, 1983)); *see also* PX 95 at 5–7 ("A Memo" from David W. Glenn, Director, FSLIC, to FHLBB (Aug. 9, 1983)). Thereafter, representatives of Syosset and the Bank Board engaged in detailed negotiations regarding the nature of the assistance FSLIC would provide, the accounting treatment that Syosset and its subsidiary would apply, and the period of amortization of goodwill that the transaction would generate. The negotiations proceeded along the lines outlined in Syosset's April 1983 amended bid until Syosset's outside counsel working on the transaction, John R. Hall, received on July 5, 1983 an undated letter from the Bank Board that was inconsistent with the terms Syosset had been seeking in two important respects. Tr. 817:10 to 818:3 (Test. of Hall); *see* PX 6 (Letter from Lawrence W. Hayes, Senior Associate General Counsel, FHLBB, to Hall). In that letter, the Bank Board agreed that FSLIC's cash contribution and the resulting goodwill would count toward computing Suffolk Phoenix's net worth, but the Bank Board specified a thirty-five year amortization period in lieu of the forty-year period Syosset proposed. PX 6 at 6; Tr. 117:3–13 (Test. of Fuster); Tr. 818:4–19 (Test. of Hall). The letter further stated the Bank Board's understanding that such accounting treatment was allowed by regulatory accounting principles ("RAP") rather than GAAP. PX 6 at 6; Tr. 117:3 to 118:11 (Test. of Fuster). Syosset did not consent to these terms.

Instead, Mark Fuster, Syosset's senior vice president, treasurer, and chief financial officer, made handwritten changes to a draft of the Assistance Agreement that Syosset received from FSLIC to reflect the terms that Syosset had originally proposed. Tr. 124:25 to 133:12 (Test. of Fuster); PX 87 (draft Assistance Agreement (date illegible)); PX 7 at GTP0031225–26 (Fuster's handwritten changes to draft Assistance Agreement); PX 502 (demonstrative of Fuster's handwritten changes to draft Assistance Agreement in typewritten form). In pertinent part, Mr. Fuster proposed that changes be made to the accounting section, Section 10, specifying that the applicable accounting principles would include those "in effect for mergers and acquisitions prior to the issuance of FASB # 72, permitting the use of 'push down accounting' as noted in R Memorandum # 55 and those accounting principles used by [Syosset] prior to this agreement." PX 7 at GTP0031225; PX 502. Mr. Fuster informed the regulators of these requested changes at a meeting between representatives of Syosset and the government held in July 1983 at the Bank Board's Washington, D.C. offices. Tr. 133:13 to 134:16 (Test. of Fuster); 818:21 to 821:7 (Test. of Hall). The regulators accepted Mr. Fuster's terms and added his proposed language to a draft dated July 13, 1983 and to the final Assistance Agreement. Tr. 134:17–19, 135:6 to 136:2 (Test. of Fuster); PX 90 at 19 (draft Assistance Agreement (July 13, 1983)); PX 1 at 19–20 (executed Assistance Agreement (Aug. 17, 1983)).

In connection with the transaction, Suffolk Phoenix converted to a federal stock savings bank and changed its name to The Long Island Savings Bank of Centereach FSB. PX 1 at 1. Syosset acquired Centereach as a wholly owned subsidiary by paying $100,000 cash for all of Centereach's stock. *Id.* Pursuant to the assistance agreement entered by the parties, FSLIC paid $75 million to Centereach as a direct contribution to the bank's net worth, *id.* § 3(a), and FSLIC paid Syosset $63 million in the form of a five-year promissory note in exchange for an ICC in the same amount issued by Syosset. *Id.* § 5(b). In return, Syosset assumed responsibility for the $62 million of outstanding ICCs and NWCs that Suffolk Phoenix had issued. *Id.* § 9(c)(3)-(4). Syosset was further obligated to maintain Centereach's net worth at one percent of Centereach's liabili-

622

ties for ten years following the date of acquisition, after which period Syosset would maintain the subsidiary's net worth at the level required by regulation for institutions insured for twenty years or more. *Id.* § 9(a).

Syosset applied the push-down method to account for the acquisition, and Centereach recorded approximately $625.4 million of goodwill on its books, records, and audited financial statements, which amount was to be amortized over forty years by the straight-line method. Tr. 155:9 to 156:19 (Test. of Fuster); PX 105 at LIP0828908, LIP0828910 (Centereach's Explanation of Purchase Accounting Transactions (Aug. 17, 1983)); PX 109 at GTP0097041–42 (the banks' Consolidated Financial Statements (1983 & 1982)). Absent the ability to include this massive amount of goodwill in the computation of Centereach's regulatory capital, Centereach would have had a negative net worth of approximately $550 million and, on a consolidated basis, would have overwhelmed Syosset's retained earnings. Tr. 156:23 to 157:1 (Test. of Fuster). As required by the Bank Board's resolution approving the transaction, Syosset submitted a letter from its independent accounting firm, Peat, Marwick, Mitchell & Co., opining that the acquisition had been accounted for in accordance with GAAP. PX 9 (Letter from Nacos to Vigna attaching accountant's letter (Nov. 17, 1983)). The supervisory agent at the Bank Board received that opinion letter and found it to be acceptable. Tr. 2147:20 to 2148:5 (Test. of Vigna).

### Syosset's and Centereach's Successful Operations

On a consolidated basis, Syosset's acquisition of Centereach enabled Syosset to increase its branch network fourfold, from twelve to forty-eight branches, and to grow its assets more than threefold, from approximately $1.2 billion to $4.1 billion. PX 104 at LIP0000045–46 (Nacos's copy of closing binder entitled "Acquisition of Suffolk County Federal Savings and Loan Association" (Aug. 17, 1983)); PX 109 at GTP0097037 (the banks' Consolidated Financial Statements (1983 & 1982)). After Syosset's acquisition of Centereach, the two banks operated with

separate accounts but were effectively run in tandem, with almost identical board members and officers, and with a single loan department. Tr. 1155:25 to 1158:6 (Test. of Viklund). The two banks' operations were virtually indistinguishable, with only the fine print on signage and filigree denominating either Syosset or Centereach. *See id.* Operating pursuant to a very conservative philosophy, the banks lended locally to buyers of single-family homes and one– to four-unit properties. Tr. 657:15 to 658:10 (Test. of Fuster); Tr. 3913:19 to 3914:21, 3915:10 to 3917:16 (Test. of Conway). The banks developed a practice of selling fixed-rate loans into the secondary market while keeping floaters, or adjustable-rate loans. Tr. 1361:21 to 1365:18 (Test. of Singer); Tr. 5609:4–17 (Test. of Fuster). Their purpose was to keep themselves "asset-sensitive, which means your assets reprice faster than your liabilities." Tr. 1365:8–9 (Test. of Singer). The banks, through Centereach, had also kept a folio of deeply discounted loans acquired with the Suffolk Phoenix transaction. Those loans had a substantial mark-to-market gain that was being accreted over the life of the assets. Tr. 1365:21 to 1366:14 (Test. of Singer). The banks also developed some new lines of business, especially home-equity loans at floating rates, that proved to be excellent assets for the bank. Tr. 1364:15 to 1365:11 (Test. of Singer). They also issued a few student loans. Tr. 5607:8–11 (Test. of Fuster).

As the years passed, the consolidated statements of the banks' financial condition show that the tangible-capital deficit in Centereach was gradually being reduced by retained earnings. *See* PX 109; PX 125 (the banks' Consolidated Financial Statements (1984 & 1983)); PX 130 (the banks' Consolidated Financial Statements (1985 & 1984)); PX 141 (the banks' Consolidated Financial Statements (1986 & 1985)); PX 145 (the banks' Consolidated Financial Statements (1987 & 1986)); PX 152 (the banks' Consolidated Financial Statements (1988 & 1987)); PX 180 (the banks' Consolidated Financial Statements (1989 & 1988)). Between 1983 and 1989, Syosset and Centereach on a consolidated basis increased their total assets from $4.1 billion to $5.3 billion and total deposits from $3.2 billion to $4.4 billion.

*Compare* PX 109 at GTP0097037, *with* PX 180 at LIP0017412. The banks further expanded their operations in April 1986 with the FSLIC-assisted acquisition of Flushing Federal Savings and Loan Association, which had approximately $422 million in assets and eight branches located in Queens, Nassau, and Suffolk counties. PX 145 at LIP0148358–59 (the banks' Consolidated Financial Statements (1987 & 1986)); Tr. 214:12–22 (Test. of Fuster); Tr. 1006:14 to 1007:3 (Test. of Viklund). During the same period, the banks unsuccessfully sought other acquisitions, and they closed or sold several branches located outside the Long Island tri-county area. Tr. 215:24 to 216:25 (Test. of Fuster); Tr. 1009:19 to 1011:3, 1014:17 to 1015:12 (Test. of Viklund); PX 131 (Minutes of Syosset's board meeting (Nov. 11, 1985)); PX 154 (Syosset's proposal to acquire four branches of Goldome (Oct. 24, 1988)).

### The Advent of FIRREA

The enactment of FIRREA on August 9, 1989 eliminated or phased out the ability of thrifts to count goodwill toward regulatory capital.[7] On November 8, 1989, OTS promulgated interim regulations implementing the new capital requirements to take effect on December 7, 1989. 54 Fed.Reg. 46,845 (Nov. 8, 1989). In addition, on November 6, 1989, OTS issued Thrift Bulletin 36, which stated that a thrift that failed any one of the minimum capital requirements would be subject to "more than normal supervision" and to certain growth restrictions. DX 292 at LIP134538 (Letter from Vigna to Centereach's board of directors and managing officer attaching copies of Thrift Bulletins 36 and 36–1 (Dec. 18, 1989)). A thrift that failed one or more of the capital requirements was required, among other things, to submit to OTS a "capital plan" demonstrating that it would achieve capital compliance

no later than December 31, 1994. *Id.* at LIP134539.[8]

Subsequent to passage of FIRREA, Centereach had on its books approximately $492 million of supervisory goodwill, of which amount approximately $458 million was rendered immediately non-qualifying by the capital standards imposed by FIRREA. Tr. 224:16–20, 244:19 to 245:23 (Test. of Fuster); PX 26 Revised (Demonstrative summarizing Centereach's core capital position from 1989 through 1993 including goodwill). With FIRREA, Centereach's capital ratio plummeted from more than 8% positive to a negative 11%. Tr. 224:11–15 (Test. of Fuster); PX 21 (Summary of Centereach's quarterly regulatory capital ratios (1985–89)). By contrast, Syosset exceeded the new capital requirements. PX 205 at 1 (Internal OTS mem. from John Robinson through Jonathan Fiechter and John Downey (April 30, 1990)). Combined, the banks would have had negative $29 million of tangible capital. *Id.* at 2. As a consequence of Centereach's capital position, it retained the investment banking firm of Goldman Sachs & Co., DX 301 at 21 (Capital Plan for Centereach (Jan. 8, 1990)); Tr. 290:23 to 291:7 (Test. of Fuster), and submitted a capital plan to OTS on January 8, 1990 in accord with Thrift Bulletin 36. DX 301. Because the plan did not demonstrate that Centereach would achieve capital compliance by December 31, 1994, OTS informed Centereach that the plan was unacceptable and would be rejected, and Centereach withdrew it. *Id.* at 14; PX 197 (Internal OTS mem. from Joseph P. Kehoe, Assistant Director, OTS, to Vigna (Feb. 20, 1990)); DX 83 at 7–8 (Minutes of Syosset's board of trustees meeting (Sept. 25, 1990)); Tr. 292:7–18 (Test. of Fuster).

---

7. FIRREA mandated new capital standards as follows: "tangible" capital was to be maintained at a level "not less than 1.5 percent of the savings association's total assets," "core" capital was required to be "not less than 3 percent" of total assets, and "risk-based" capital was required to be kept at a level not "materially" lower than that required for national banks. 12 U.S.C. § 1464(t)(2). Supervisory goodwill and other unidentifiable intangible assets could not be counted towards tangible capital and were to

be phased out of calculations for "core" capital by 1995. 12 U.S.C. § 1464(t)(3)(A), (t)(9)(A)-(C).

8. A non-compliant thrift was also given the option of applying for either a temporary "capital exception" (available only in "extraordinary situations"), or a "capital exemption" from specific provisions (which exemption had to "be accompanied by an acceptable capital plan"). DX 292 at LIP134538–39.

## Centereach's Capital Plan

Over the next several months, OTS engaged in internal discussions about whether to require Syosset and Centereach to file a capital plan on a consolidated basis, and OTS eventually decided to require consolidation. PX 197; PX 199 at GTP0033235–38 (Minutes of meeting of Supervisory Policy Committee (Mar. 21, 1990)); PX 203 (Internal OTS mem. of oral communication between Kehoe and James Caton (Apr. 19, 1990)); PX 205 (Internal OTS mem. from John Robinson through Jonathan Fiechter and John Downey (Apr. 30, 1990)). At meetings between the parties held in April and May 1990, the banks urged OTS not to require the banks to consolidate, which would result in two capital-deficient institutions rather than just one, but Long Island did indicate its willingness to supplement Centereach's capital plan and to strengthen Centereach's capital position. DX 317 (Internal OTS mem. from Ruth Ann Popielarski to the files (May 1, 1990)); PX 208 (Letter from Viklund to Vigna supplementing meeting held on April 27, 1990 (May 1, 1990)); PX 11 (Internal OTS mem. from Kehoe to the files (May 8, 1990)). Following those meetings, OTS ultimately relented on its position regarding consolidation. PX 12 (Memorandum from Jonathan L. Fiechter, Principal Senior Deputy Director, OTS, to Vigna (Aug. 8, 1990)); PX 212 (Letter from Vigna to Viklund (Aug. 24, 1990)); DX 83 at 7–8 (Minutes of Syosset's board of trustees meeting (Sept. 25, 1990)). On October 25, 1990, Centereach submitted a second capital plan, pursuant to which Syosset would make additional capital contributions to Centereach through 1994, PX 13 at 32–34 (Capital Plan for Centereach (Oct. 25, 1990)), and Centereach would "determine later the precise further actions to be taken in 1994 (or thereafter), depending on the economic, regulatory, legal and other circumstances at the time." *Id.* at 42.

Centereach submitted to OTS further amendments to its capital plan in December 1990 and April 1991, PX 225 (Letter from Conway to David R. Dorgan, Senior Assistant Director, OTS (Dec. 18, 1990)); DX 1565 (Letter from Nacos to Michael Simone, Assistant District Director, OTS (Apr. 25, 1991)), and it received conditional approval in May 1991. DX 1571 (Letter from Vigna to Centereach's board of directors (May 22, 1991)). In October 1991, Centereach submitted another amendment containing amended projections, DX 389A (Letter from Conway to Rohrs (Oct. 30, 1991)), and OTS granted final conditional approval several days later. DX 387 (Letter from Angelo A. Vigna, then-Northeast Regional Director, OTS, to Centereach's board of directors (Oct. 30, 1991)). As Thrift Bulletin 36 provided, the effect of such approval was to allow Centereach to continue to operate so long as it stayed in compliance with the capital plan, *i.e.*, continued moving toward capital compliance. *See* DX 292 at LIP134538 (Letter from Angelo A. Vigna, then-District Director, OTS–New York, to LISB's board of directors and managing officer attaching copies of Thrift Bulletins 36 and 36–1 (Dec. 18, 1989)).

In April 1991, Centereach's MACRO rating was decreased from a composite rating of 2 to a composite rating of 4 "result[ing] from the institution's insolvent regulatory capital position." PX 249 (Letter from Vigna to Nacos (Mar. 25, 1992)); *see also* Tr. 286:1–20, 287:15 to 288:6 (Test. of Fuster); PX 35 (Demonstrative summarizing ratings for Syosset, Centereach, and Long Island Bancorp, Inc.); PX 35A (supporting materials for PX 35).[9] "Because of the assigned MACRO rating, Centereach [wa]s considered a troubled institution and [had to] pay the premium assessment as indicated in Thrift Bulletin

---

9. The financial regulatory entities use a rating system, initially known by the "MACRO" acronym, and after FIRREA as "CAMEL," to evaluate the viability and strength of banks. *See Globe Sav. Bank, F.S.B. v. United States*, 65 Fed.Cl. 330, 339 n. 6 (2005). The MACRO assessment evaluated the effectiveness of management and the board of directors, along with asset quality, capital adequacy, asset/liability and risk management, and earnings (operations). The CAMEL assessment addresses the same topics but refers to them as capital, assets, management, earnings, and liability. A rating of "1" is the highest rating, and a rating of "5" is the lowest. A composite "4" rating indicates that the institution "generally exhibit[s] unsafe and unsound practices or conditions" and has "serious financial or managerial deficiencies that result in unsatisfactory performance." 61 Fed.Reg. 67021, 67026 (Dec. 19, 1996).

48." PX 249. Centereach's capital deficiency also caused Fannie Mae and Freddie Mac to notify Centereach that it could no longer be a seller-servicer. Tr. 286:21 to 287:8 (Test. of Fuster).

On December 19, 1991, Congress enacted the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, 105 Stat. 2236 (1991) (codified at 12 U.S.C. §§ 1811–34b) ("FDICIA"). Section 131 of FDICIA added Section 38 to the Federal Deposit Insurance Act, entitled "Prompt Corrective Action," establishing five new capital categories for insured depository institutions: "well capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized." *Id.* § 131A, 105 Stat. at 2253 (codified at 12 U.S.C. § 1831*o* ). On September 29, 1992, final rules implementing that section were adopted by the Board of Governors of the Federal Reserve System, the Office of the Comptroller of the Currency, FDIC, and OTS. 57 Fed.Reg. 44866–901 (Sept. 29, 1992) (codified in part at 12 C.F.R. §§ 208.33 (Federal Reserve Board), 325.103 (FDIC) and 565.4(OTS) (1993)). The final rules became effective December 19, 1992, which was also the effective date of Section 131 of FDICIA. The regulations defined the five capital categories in terms of minimum capital ratios. *See, e.g.,* 12 C.F.R. § 565.4(b) (1993).[10] In addition, the regulations set out sanctions applicable to institutions deemed to be undercapitalized, significantly undercapitalized, or critically undercapitalized. *Id.* § 565.6.[11]

On November 16, 1992, OTS sent a letter to Centereach stating that Centereach would have been deemed critically undercapitalized based on its June 30, 1992 Thrift Financial Report data, had the prompt corrective action provision of FDICIA been effective at that time. PX 281 (Letter from Vigna to Centereach's board of directors (Nov. 16, 1992)). Three days after that provision took effect, OTS sent Centereach notice that Centereach's capital ratios placed it in the critically undercapitalized category. PX 293 (Letter from Vigna to Centereach's board of directors (Dec. 22, 1992)).

### The Restructuring

In April 1992, several months after FDICIA was enacted, Mr. Viklund asked Mr. Fuster and William D. Singer, the banks' chief investment officer, to develop a restructuring plan for bringing Centereach at least into the well-capitalized capital category under FDICIA. Tr. 339:18 to 340:18 (Test. of Fuster); Tr. 1076:1 to 1077:5 (Test. of Viklund); Tr. 1344:19 to 1345:13 (Test. of Singer). Messrs. Fuster and Singer concluded that in addition to reducing borrowings, realizing embedded profits in assets, and writing off its remaining goodwill, Centereach would have to shrink and sell deposits. Tr. 340:19 to 341:15 (Test. of Fuster); Tr. 1345:17 to 1346:25 (Test. of Singer). Initially, the banks' management envisioned shrinking only Centereach, but at Mr. Nacos's suggestion it also considered shrinking both Centereach and Syosset. Tr. 341:16 to 342:1 (Test. of Fuster); *see also* Tr. 1345:19 to 1346:15 (Test. of Singer). This strategy was consid-

10. Under these regulations, a bank was "[w]ell capitalized" if the bank: "(i)[h]a[d] a total risk-based capital ratio of 10.0 percent or greater; and (ii)[h]a[d] a Tier 1 risk-based capital ratio of 6.0 percent or greater; and (iii)[h]a[d] a leverage ratio of 5.0 percent or greater." 12 C.F.R. § 565.4(b)(1) (1993). The corresponding ratios for an "[a]dequately capitalized" bank were 8.0, 4.0, and 4.0, except that a leverage ratio of 3.0 or greater sufficed "if the bank [wa]s rated composite 1 under the MACRO rating system" and "[d]oes not meet the definition of a well capitalized savings association." *Id.* § 565.4(b)(2).

An "[u]ndercapitalized" bank had corresponding ratios *less than* 8.0, 4.0, and 4.0, except that such a bank could also have a leverage ratio of *less than* 3.0 if it maintained a composite rating of 1 under the MACRO System and was not

significantly growing. *Id.* § 565.4(b)(3). A "[s]ignificantly undercapitalized" bank had ratios *less than* 6.0, 3.0, and 3.0. *Id.* § 565(b)(4). A "[c]ritically undercapitalized" bank had a "ratio of tangible equity to total assets that [wa]s equal to or less than 2.0 percent." *Id.* § 565(b)(5).

11. Such a bank became subject to the provisions of 12 U.S.C. § 1831*o*(d), (e)(1), (e)(2), (e)(3), and (e)(4), restricting payment of capital distributions and management fees, requiring that the banking agency monitor the condition of the bank, requiring submission of a capital restoration plan, restricting the growth of the bank's assets, and requiring prior approval of certain expansion proposals. 12 C.F.R. § 565.6(a)(2) (1993). In addition, the compensation paid to senior executive officers could be restricted. *See id.* § 565.6(a)(3).

ered because, although Centereach was progressing ahead of the projections of its capital plan, the banks' management realized that Centereach could not achieve capital compliance on its own. Tr. 342:2 to 344:3 (Test. of Fuster); PX 518 (Demonstrative showing capital still needed by Centereach after mitigation efforts to June 30, 1992). Mr. Fuster and his staff additionally considered and rejected merging the two banks without shrinkage, concluding that it was not reasonable to sacrifice Syosset's favorable capital position in a circumstance in which the resulting entity would still be subject to a capital plan. Tr. 344:25 to 345:8 (Test. of Fuster).[12]

In August 1992, a restructuring committee of the banks was formed and selected the investment banking firm of Bear, Stearns & Co. ("Bear Stearns") to prepare a restructuring analysis. PX 260 at 1 (Minutes of restructuring committee meeting (Aug. 24, 1992)); see also PX 263 at 4 (Syosset's board of trustees meeting (Sept. 22, 1992)); PX 269 (Letter from Robert A. Baer, Jr., Senior Managing Director, Bear Stearns, to Viklund confirming the banks' engagement of Bear Stearns (Oct. 21, 1992)); Tr. 346:17 to 347:2 (Test. of Fuster). Bear Stearns performed its due diligence during September and October of 1992, Tr. 350:2–4 (Test. of Fuster); PX 261 (Preliminary due diligence request list from Bear Stearns to Syosset (Aug. 25, 1992)), and presented its final restructuring analysis and recommendation to the banks' boards the following month. PX 14 (Presentation on Restructuring Alternatives (Nov. 19, 1992)); PX 283 at LIP0119461–68 (Minutes of Centereach's board of directors meeting (Nov. 19, 1992)). The plan recommended by Bear Stearns involved achieving a targeted 5.25% capital ratio by selling branches with $1.0 billion of deposits, funded by the

sale of $1.25 billion of securities and loans, paying down other borrowings of $250 million, merging Centereach and Syosset, and writing off goodwill. PX 14 at GTP0057159, GTP0057162–63; PX 283 at LIP0119463–64. Bear Stearns considered and rejected several restructuring alternatives, including a targeted capital ratio of 5%, because that option would not provide for any capital cushion whatsoever. PX 14 at GTP0057159. In addition, Bear Stearns analyzed and rejected targeting a 6% capital ratio, which alternative would result in a severe impact on future earnings and a high expense ratio. Id.

Following Bear Stearns's presentation, the banks' boards decided to implement Bear Stearns's recommended plan. PX 283 at LIP0119469; Tr. 935:5–18 (Test. of Donald Wenk, chairman of Syosset's board of directors, succeeding Conway); Tr. 1437:13–25 (Test. of John J. Conefry, chairman of Syosset's board of directors and chief executive officer at relevant times). The banks submitted their restructuring plan to OTS on November 23, 1992, DX 1657 (Letter from Viklund to Vigna (Nov. 23, 1992)), and the following month OTS provided written notice that it did not object to that plan and considered the proposed restructuring an acceleration of the resolution of Centereach's capital deficiency addressed in Centereach's capital plan. PX 297 (Letter from Vigna to Centereach's board of directors (Dec. 23, 1992)).

In furtherance of their restructuring plan, Centereach and Syosset began paying down borrowings, selling assets, and taking preparatory steps to sell branches. Based on the earlier work of Messrs. Fuster and Singer, as examined and verified by Bear Stearns, the banks knew they would have to sell a significant volume of their better earning assets to fund the sale of the branches. On behalf of the banks, Mr. Singer began select-

---

12. Messrs. Fuster, Singer, and other members of the banks' management briefly considered a possible sale of Centereach to, or merger of Centereach with, a healthy banking institution but rapidly abandoned that option because of Centereach's significant tangible-capital deficit. Tr. 344:12–24 (Test. of Fuster). They did not consider conversion to a stock company. Tr. 345:9 to 346:12 (Test. of Fuster). Mr. Fuster testified that "[t]he only motivation we had in developing [the restructuring] plan was to get rid of the capital plan." Tr. 346:15–16 (Test. of Fuster). The banks explicitly rejected the proposal of one investment advisor, Sandler O'Neill, which at that time (August 1992) focused more on making a proposal to buy the bank themselves or take it public through a conversion. Tr. 1355:2–23 (Test. of Singer) ("We had no desire to go public. Our desire was to solve our capital problem and grow the company and manage it, as we had managed it for a number of years.").

ing and assembling sizable packages of loans and mortgage-backed securities for sale and making sales. Tr. 1363:19 to 1364:14 (Test. of Singer). As to the branches, the banks initially considered selling branches clustered in particular locations, but ultimately developed a list of twenty branches that could be sold, with the buyer to pick ten branches from this list. Tr. 735:17 to 736:21 (Test. of Fuster).

In due course, in April 1993 Syosset and Centereach entered into an agreement in principle with Home Savings of America ("Home Savings") to sell to the latter thrift ten branches in the tri-county area which then had approximately $950 million of deposits. PX 309 (Joint press release of Home Savings and the banks (Apr. 29, 1993)). The three banks entered into a Purchase of Assets and Liability Assumption Agreement in June 1993, pursuant to which Home Savings would purchase five branches of Syosset and five branches of Centereach. PX 311 at GTP0069185 (Purchase of Assets and Liability Assumption Agreement (June 9, 1993)). The parties to the transaction submitted a joint application to OTS in July 1993, and OTS conditionally approved the application the following month. PX 327 (Letter from Thomas F. Sharkey, Assistant Regional Director, West Region, OTS, to William J. Wiley, Vice President, Home Savings, and Nacos (Aug. 4, 1993)). Closing the deal on September 3, 1993, Syosset and Centereach paid Home Savings $817,195,112 to assume $836,253,302 of deposits. PX 333 at GPT0069110 (Summary of branch sale accounting (Sept. 3, 1993)); DX 606 at 5, 33 (Long Island Bancorp, Inc.'s Prospectus (Feb. 14, 1994)).[13]

Concurrently with this transaction, Syosset merged into Centereach, a "reverse" merger of the parent into the subsidiary, and the resulting entity took the name The Long Island Savings Bank, FSB ("Long Island" or "Bank"). PX 324 (Letter from Vigna to Viklund granting conditional approval of Center-

each's application to convert to mutual charter and acquire by merger Syosset (July 30, 1993)); PX 325 (Letter from Vigna to Viklund granting conditional approval of Centereach's application to transfer Syosset's Assistance Agreement to Centereach (July 30, 1993)); PX 335 (Memorandum from Viklund to Long Island's employees (Sept. 7, 1993)); DX 606 at 5, 33.[14] In connection with the merger, Long Island adopted SFAS 72 and wrote off its remaining goodwill balance, resulting in a charge of approximately $442 million to earnings in the Bank's fiscal year that ended September 30, 1993. Tr. 365:8–25 (Test. of Fuster); PX 519 (Demonstrative showing Long Island's goodwill write-off); DX 606 at 5, 33, F–8. Because the merger succeeded in making the surviving entity well capitalized for purposes of FDICIA, albeit barely, on September 3, 1993, OTS terminated Centereach's capital plan. PX 332 (Letter from Vigna to Long Island's board of directors (Sept. 3, 1993)).

To fund the branch-sale payment made to Home Savings, Bear Stearns had initially projected that Syosset and Centereach would need approximately $1.1 billion. DX 926 at PLI169 1556 (Bear Stearns's presentation to the Special Committee of Long Island (Sept. 29, 1992)). Following the announcement in April 1993 of the sale of the ten branches, however, those branches experienced deposit runoff in the amount of approximately $114 million, reducing their total deposits to approximately $836 million. Tr. 5498:10 to 5499:11 (Test. of Dr. Nevins Baxter, an expert witness for plaintiffs); PX 803 (Demonstrative showing deposit runoff in the sold branches); PX 333 at GPT0069110 (Summary of branch sale accounting (Sept. 3, 1993)). Because of that runoff, Mr. Singer sold more assets than the amount that ultimately became necessary. Tr. 5606:9–22 (Test. of Fuster).

The banks sold a variety of assets. They *sold their portfolio of student loans to Sallie*

---

**13.** Non-compete covenants in the branch sale agreement with Home Savings limited future growth through deposit acquisitions in certain counties until 1996. Tr. 598:16–23 (Test. of Fuster).

**14.** The complaint in this action was filed on August 3, 1992, more than a year prior to the merger on September 3, 1993. Because of this sequential timing, Long Island's predecessors, Syosset and Centereach, are the plaintiffs named in the suit.

Mae. They securitized and sold approximately $300 million of home equity lines of credit ("HELOCs") (on which the banks retained servicing). They also securitized and sold a package of fixed-rate whole loans, (in which the banks retained some servicing rights), and sold a portfolio of mortgage-backed securities, together totaling approximately $272 million. *See* Tr. 359:4–15, 5601:1–11, 5602:10 to 5603:6, 5607:3 to 5608:20 (Test. of Fuster); Tr. 1364:2–14, 1365:21 to 1366:4, 1370:10 to 1377:2 (Test. of Singer); PX 296 (Letter from Singer to Simone (Dec. 23, 1992)); DX 926 PLI169 1556; PX 14 at GTP0057163 (Presentation on restructuring alternatives (Nov. 19, 1992)). The banks would not have sold the HELOCs but for the restructuring, because those loans produced a favorable net interest margin with a relatively short duration. Tr. 360:2–14 (Test. of Fuster); Tr. 1364:15 to 1365:11 (Test. of Singer). Likewise, the agency mortgage-backed securities and whole loans would not have been sold in the ordinary course because Long Island "could not replace them in the market at the current yield that they were throwing off." Tr. 1366:5–14 (Test. of Singer). Some of those loans and securities had been marked to market at a discount in connection with the Suffolk Phoenix transaction, and Centereach had been amortizing gains on those marked-to-market loans and securities, but market-related gains were realized upon their sale. Specifically, the sale of these assets produced an accretion gain of approximately $41 million and a $3 million gain on a cash basis. PX 296; Tr. 1365:23 to 1366:4 (Test. of Singer); Tr. 5609:23 to 5611:4 (Test. of Fuster). The banks invested the proceeds of the sales in short-term securities in anticipation of the need to fund the branch sale, and it retained the securities to the extent it did not need the funds for the branch sale. Among other things, it expanded its portfolio of U.S. Treasury securities. PX 391 at 44 (Long Island Bancorp, Inc.'s annual report (1994)).

Immediately prior to the branch sale and merger, on August 31, 1993, the capital ratio of the banks on a consolidated basis was 4.26%, an improved but still insufficient ratio that reflected the sale of assets and reduction in borrowings to prepare for the branch sale. Tr. 368:6 to 369:5 (Test. of Fuster); PX 520 (Demonstrative showing tangible-capital ratios of banks before and after restructuring). Subsequent to the branch sale and merger, on September 30, 1993, the Bank's capital ratio was 5.31%, *i.e.*, only 0.31% above the minimum ratio for the well capitalized level. Tr. 369:6–12 (Test. of Fuster); PX 520.

OTS and FDIC conducted examinations of the banks commencing prior to their restructuring and concluding subsequent to the restructuring and their merger. PX 15 (FDIC's report of examination (commenced July 6, 1993)); PX 328 (OTS report of examination (commenced Aug. 11, 1993)). Representatives of both regulatory entities met with Long Island's board of trustees on October 26, 1993 to present the findings of their respective examinations. PX 15 at GTP0056285; PX 328 at 3; PX 16 at 7–10 (Long Island's board of trustees meeting (Oct. 26, 1993)). OTS indicated in its report that "[t]he principal area of concern is asset quality as the level of delinquencies in the various loan portfolios remains high," PX 328 at 1, and that asset quality is "considered less than satisfactory." *Id.* at 5. Despite this finding with respect to the MACRO factor of asset quality, OTS informed Long Island that OTS assigned the Bank a composite MACRO rating of "2." PX 328 at 2; PX 15 at GTP0056285; PX 16 at 8; Tr. 369:23 to 370:3 (Test. of Fuster); PX 35 (Demonstrative summarizing ratings for Syosset, Centereach, and Long Island Bancorp, Inc.); PX 35A (supporting materials for PX 35) at PX035A–0026 (Letter from Rohrs to Long Island's board of directors (Oct. 28, 1993)).

For its part, FDIC agreed with OTS that Long Island's level of nonperforming assets posed a problem; however, FDIC considered the problem so serious as to disqualify the Bank from a composite "2" rating. FDIC observed at the meeting that the restructuring and merger "had brought capital up to 5%, but in the process, the Bank had to sell some high earning and good assets." PX 16 at 9; *see also* PX 15 at GTP0056283 (stating FDIC's opinion that "[a]lthough capital is now above regulatory requirements, the volume of marginal and inferior quality assets remains at a high level and will continue to have a negative impact on earnings perform-

ance in the future"); *id.* at GTP0056285 (FDIC's representatives informing Long Island that in FDIC's view, "[t]he asset sale transaction was seen as negatively impacting future earnings performance"). Consequently, FDIC assigned Long Island a composite rating of "3." PX 15 at GTP0056285; *see also* PX 16 at 9.

In an effort to increase its capital ratio subsequent to the merger in the circumstance of the Bank's shrinkage by 20%, and coincidentally to improve its MACRO rating, Long Island began to look internally to reduce expenses, Tr. 372:2–16 (Test. of Fuster), and to dispose of non-earning assets. Tr. 387:9 to 388:2 (Test. of Fuster); *see also* Tr. 368:23 to 369:22 (Test. of Fuster). In that connection, as FDIC observed in its report of examination, Long Island's "short term goal for fiscal 1994 is to reach a tangible equity to assets ratio of 6.00%." PX 15 at GTP0056283 (FDIC's report of examination of Long Island (commenced July 6, 1993)); *see also* DX 441 at 4 (Long Island's Corporate Strategic Plan & Operating Budget for the Fiscal Year Ending Sept. 30, 1994 (Sept. 28, 1993)); Tr. 384:13 to 386:9 (Test. of Fuster). Although Long Island's short-term goal was to achieve a 6% tangible-capital ratio, Long Island's board wanted to operate the Bank at a capital ratio of 8% to 9%, the level at which the banks had been operating pre-FIRREA. Tr. 372:17 to 373:4 (Test. of Fuster); Tr. 1122:18–20 (Test. of Viklund); *see also* PX 21 (Demonstrative summarizing Center-each's/Syosset's quarterly regulatory capital ratios from 1985 through 1998); PX 22 (Demonstrative summarizing Syosset's quarterly regulatory capital ratios from Dec. 1985 through June 1993).

To improve its risk profile, Long Island sought to put together a package of its nonperforming and underperforming loans and a separate package of its real estate owned, such that the packages might be sold in bulk. Tr. 387:9 to 388:2 (Test. of Fuster). At the time, Long Island's officers were concerned that the losses incurred on such a sale might drop Long Island's tangible-capital ratio below the FDICIA well-capitalized level. Tr. 387:21–24 (Test. of Fuster). The Bank retained Merrill Lynch as its advisor for the

transaction, and the Bank exercised caution to avoid too large a loss on the sale. Tr. 392:3 to 19 (Test. of Fuster); PX 352 at 8 (Minutes of Long Island's board of trustees meeting (Nov. 23, 1993)). In December 1993, Long Island entered into a contract for the bulk sale of the resulting package of nonperforming and underperforming loans (the "Bulk Sale"). Tr. 392:13–19 (Test. of Fuster); PX 391 at 19 (Long Island Bancorp, Inc.'s annual report (1994)); PX 354 at 1.1 (Conversion Valuation Appraisal Report (Dec. 17, 1993)). The real estate owned was sold separately from the Bulk Sale of the loans. PX391 at GTP0083019. As of September 30, 1993, the book value of the loans to be sold was approximately $142.0 million, and that of the real estate to be sold was about $14.0 million. PX 391 at GTP0083019; *see also* PX 354 at 1.3. The sale of the loans was completed by December 31, 1993, and the sale of the real estate was consummated in the second quarter of fiscal year 1994. PX 391 at GTP0083019. On September 30, 1993, the values of the assets sold in the Bulk Sale were adjusted to market based on the sales price established in the Bulk Sale. *Id.*

In sum, as a result of the Bank's restructuring actions, including sale of assets, diminution of borrowings, the branch-deposit sale, the write-off of goodwill, the Bulk Sale, and the sale of real estate owned, the Bank's total assets declined from $5.6 billion as of September 30, 1992 to $4.0 billion as of September 30, 1993. *Id.* Long Island's tangible-capital ratio reached and remained above 5%, albeit barely. On December 31, 1993, after the Bulk Sale had been made, Long Island's tangible capital was $224.536 million and its tangible capital ratio had dropped to 5.27%. PX 423, Ex. C at 4 (Expert Report of Charles W. Calomiris (June 14, 2004)). By March 31, 1994, after the real estate owned had been sold, Long Island's tangible capital had dropped slightly more, by $296,000, to $224.240 million. *Id.*

### Long Island's Conversion to a Stock Company.

Long Island's restructuring efforts did not succeed in bringing the Bank's capital ratio to the level which the Bank's management considered necessary to continue operating

the institution. Tr. 939:3–13 (Test. of Wenk); *see also* Tr. 369:6–22, 372:17 to 373:4, 383:23 to 384:9 (Test. of Fuster); Tr. 1122:18–20 (Test. of Viklund). In August 1993, several months prior to the Bulk Sale, the Bank had formed an ad hoc committee and appointed Mr. Conefry as chair to evaluate Long Island's capital condition subsequent to its restructuring efforts and to recommend alternatives for acquiring sufficient capital. PX 329 at LIP0041916–17 (Minutes of Long Island's board of directors meeting (Aug. 24, 1993)); Tr. 939:3–23 (Test. of Wenk); Tr. 1442:11–17, 1548:1–10 (Test. of Conefry); PX 367 at LIP0181276 (Memorandum from Conefry to distribution among Long Island's directors). The committee requested reports in this regard from seven Wall Street firms, all of which advised that additional capital was necessary and that a conversion from a mutual to a stock company was the only practicable means of raising such capital. Tr. 1443:15 to 1444:7, 1548:11 to 1549:1 (Test. of Conefry); PX 367 at LIP0181276.[15]

In accord with this advice, in November 1993, Long Island began the process of converting to a stock company. PX 349 (Minutes of Long Island's special board of trustees meeting (Nov. 16, 1993)); PX 351 at LIP0172208 (Memorandum from Wenk to Long Island's employees (Nov. 19, 1993)); PX 352 at 10 (Minutes of Long Island's board of trustees meeting (Nov. 23, 1993)). The Bank retained Merrill Lynch and Salomon Brothers Inc. to underwrite the conversion. Tr. 944:10–11 (Test. of Wenk). In addition, Long Island retained RP Financial, Inc. to provide an appraisal of the pro forma market value of the common stock to be issued by a newly formed holding company, Long Island Bancorp, Inc. ("Long Island Bancorp") and to prepare a business plan for the period through September 30, 1997. DX 1082A (Letter from Ronald S. Riggins, President and Managing Consultant, RP Financial, to Conefry confirming engagement for appraisal (Oct. 27, 1993)); PX 345 (Letter from Riggins to Conefry confirming engagement for business plan (Oct. 27, 1993)); PX 354 (Conversion Valuation Appraisal Report

(Dec. 17, 1993)); PX 357 (Business Plan (Dec. 30, 1993)).

Long Island's conversion was "motivated by the need for capital[, a]pproximately three hundred million dollars of [which] capital need can be attributed to the government mandated write-off of supervisory goodwill and the related divestiture of 20% of the bank's business for the purposes of complying with a government mandated capital plan." PX 367 at LIP0181276 (Memorandum from Conefry to distribution among Long Island's directors (Feb. 24, 1994)); *accord* Tr. 1446:20 to 1447:4 (Test. of Conefry); Tr. 1382:9 to 1383:11 (Test. of Singer). As Merrill Lynch advised the Bank, "[i]ncreased capital provides greater operating flexibility and a cushion against unanticipated losses." PX 331 at LIP0155255 (Merrill Lynch's presentation to Long Island (Sept.1993)). Long Island's management believed that raising capital via a conversion would assist the Bank in competing with its peers, provide access to additional capital markets, and strengthen its customer services, lending, and investment operations. PX 349 at LIP0091182 (Minutes of Long Island's special board of trustees meeting (Nov. 16, 1993)); *see also* Tr. 1447:5–11 (Test. of Conefry). Mr. Fuster testified that Long Island could not have competed effectively in its market while it was only minimally in compliance with capital requirements:

Q. [Mr. Infelise] ... [I]t's true isn't it that Long Island Savings Bank's decision to convert from a mutual to a thrift [stock] institution in April of 1994 was not necessary for Long Island Savings Bank to attain capital compliance, was it?

A. [Mr. Fuster] While the bank may have been in compliance at the point that it converted, it certainly was only minimally in compliance and could not realistically grow or compete without the ability of having additional capital.

Tr. 764:3–11 (Test. of Fuster). OTS indicated that it was "very pleased" with Long Island's plans for conversion and an initial public offering ("IPO"). Tr. 1489:14 to

---

15. The seven firms were Merrill Lynch, Salomon Brothers, Goldman Sachs, Bear Stearns, Smith Barney, Sandler O'Neil, and Adams & Cohen. PX 367 at LIP0181276.

1490:4 (Test. of Conefry); *see also* PX 349 at LIP0091182.

The appraisal evaluation for the conversion was done by Mr. Ronald Riggins of RP Financial. The original appraisal was completed on December 17, 1993, and filed with OTS. PX 354 (Conversion Valuation Appraisal Report for The Long Island Savings Bank, FSB (Dec. 17, 1993)); Tr. 1650:9 to 1654:11 (Test. of Riggins). That report indicated that the estimated midpoint of the pro forma market value of the to-be-issued common stock was $225,000,000, based on the proposed issuance of 22,500,000 shares at $10.00 a share. *Id.* at LIP0035247. The valuation was principally driven by Mr. Riggins' assessment of Long Island's earning potential relative to that of a peer group. Tr. 1690:14 to 1698:5 (Test. of Riggins). *See also* Tr. 1658:12 to 1706:9 (Test. of Riggins). The conversion regulations contemplated establishing a range of value, from 15 percent below the appraised value (the "minimum"), to 15 percent above the midpoint (the "maximum"). OTS also provided for an upper limit, which is 15 percent above the maximum (the "super maximum"). Tr. 1655:10–16 (Test. of Riggins). The appraisal and the application for conversion were approved by OTS, a prospectus was prepared and proffered to OTS and the Securities and Exchange Commission ("SEC"), and then the prospectus was publicly issued on February 14, 1994, following the incorporation of comments by OTS and SEC. Tr. 1651:5 to 1652:2 (Test. of Riggins). After an appraisal update was issued on April 6, 1994, the public offering took place and yielded $297.6 million, the "super maximum." Tr. 1656:5–15 (Test. of Riggins). The IPO was a so-called "community" offering, basically to Long Island's depositors, and was heavily oversubscribed; 90% of the shares were purchased by depositors and the remaining 10% were issued for Long Island's newly formed employee stock option plan and its management retention plan. Tr. 1385:6–19 (Test. of Singer); Tr. 1656:18 to 1658:11 (Test. of Riggins); PX 391 at GTP0083002 (Long Island Bancorp's 1994 annual report). The shares were sold to the depositors at $11.50 a share. Tr. 5597:6–8 (Test. of Fuster).

The conversion was completed on April 14, 1994. Tr. 392:24–25 (Test. of Fuster); PX 391 at GTP0083002 (Long Island Bancorp's annual report (1994)). Long Island Bancorp ultimately realized $296.9 million of net proceeds from the IPO, $164 million of which amount was contributed to the Bank in exchange for all of its issued and outstanding common stock. Tr. 393:22 to 394:2, 394:22–25 (Test. of Fuster); PX 521 (Demonstrative showing conversion proceeds); PX 391 at GTP0083018, GTP0083041. The Bank used $23.8 million of that contribution for an Employee Stock Ownership Plan ("ESOP") and $8.9 million for a Management Recognition and Retention Plan ("MRP"). Tr. 394:5–21 (Test. of Fuster); PX 521; PX 391 at GTP0083018, GTP0083036, GTP0083041–42. The remaining conversion proceeds of approximately $100.2 million were retained at the holding company level. The holding company was required by OTS regulations to transfer to the Bank at least 50% of the net conversion proceeds. Tr. 5579:19–25 (Test. of Fuster). That amount would have been approximately $148 million. Tr. 5580:4–6 (Test. of Fuster). However, the Bank actually transferred $164 million, more than required, because "[t]he bank and the holding company wanted the bank to have at least an 8 percent capital ratio going into its new existence as a public company." Tr. 5580:12–14 (Test. of Fuster).

Long Island's Post–Conversion Operations and Subsequent Merger with Astoria

Following Long Island's conversion and IPO, by September 30, 1994, the Bank had achieved a tangible capital level of almost $360 million, increasing its tangible-capital ratio to 8.14%. Tr. 395:23 to 396:4 (Test. of Fuster); PX 522 (Demonstrative showing Long Island's tangible capital and tangible-capital ratio); PX 391 at GTP0083032. Through the conversion, the Bank had completed the task of replacing the goodwill lost as regulatory capital by the enactment of FIRREA. Long Island focused on its operations. In November 1994, Long Island expanded its origination business, acquiring eleven loan servicing and lending offices from Entrust Financial Corporation and a retail lending office from Developer's Mortgage Corporation, expanding such services to in-

clude Pennsylvania, Delaware, Maryland, Virginia, and Georgia. PX 394 at GTP0077838 (Long Island Bancorp's annual report (1995)). Long Island promptly began to pay a dividend. As Mr. Singer explained:

> The decision to pay dividends, the company was earning money or earning capital, the decision to pay dividends was ours because we did what was known as a community offering, which we basically offered the stock to our depositors. Depositors had taken money out of their savings and/or CD accounts and bought stock. They were foregoing interest on their savings, and we were paying a dividend back to them as a return of some of the, quote, what you would call, interest income that they were losing on the deposits because they had bought the stock. So we looked at it as a way of returning to them some of the interest income they would have had had they left the money in the bank as a deposit.

Tr. 1385:4–16 (Test. of Singer). The process of paying dividends had two steps. Long Island Savings Bank paid dividends to Long Island Bancorp and Bancorp paid dividends to shareholders. The Bank paid dividends to Bancorp as follows:

| Fiscal year [16] | Dividend |
|---|---|
| 1995 | $10,800,000 |
| 1996 | 10,500,000 |
| 1997 | 20,000,000 |
| 1998 | 25,000,000 |

PX 423, Ex. D (Expert Report of Charles W. Calomiris (June 14, 2004)). Overall, Bancorp paid dividends to its shareholders and repurchased its stock [17] in the following amounts:

| | Repurchases | Dividends |
|---|---|---|
| Fiscal year 1995 | $17,812,000 | $ 9,693,000 |
| Fiscal year 1996 | $42,043,000 | $ 9,171,000 |
| Fiscal year 1997 | $24,017,000 | $13,378,000 |
| Fiscal year 1998 (part year) | $ 6,894,000 | $11,214,000 [18] |

PX 404 at 31 (Long Island Bancorp's annual report 1997); DX 597 at BAN0000134–36 (Long Island Bancorp's Form 10-Q (Aug. 14, 1998)); Tr. 701:20 to 705:11 (Test. of Fuster). Long Island Bancorp initially paid a quarterly dividend of 10 cents per share. PX 423, Ex. D (Expert Report of Charles W. Calomiris (June 14, 2004)). That dividend was increased to 15 cents per share in the first quarter of fiscal year 1997 and to 20 cents per share in the third quarter of 1998. *Id.* In addition to steadily increasing dividends, Long Island Bancorp's shareholders benefitted from a strong increase in the price per share of Long Island's stock, from $11.50 per share at the initial public offering in April 1994 to $47.00 per share at September 30, 1997. PX 404 at LIP0083716 (Long Island Bancorp annual report (1997)).

On April 2, 1998, an agreement and plan of merger was signed between Long Island Bancorp and Astoria Financial Corporation, pursuant to which each share of the former would be exchanged for 1.15 shares of the latter. PX 406 at VLI004 0549–0550 (Astoria Financial Corp.'s 14(a) definitive proxy statement (July 17, 1998)). The transaction was consummated on September 30, 1998, with Long Island and Long Island Bancorp merging into Astoria Federal Savings and Loan Association and Astoria Financial Corp., respectively. Tr. 612:25 to 613:10 (Test. of Fuster). For each share of Long Island's common stock, Long Island's shareholders received Astoria shares valued at $48.44, for a capital gain of 321%, or 38% on an annual-

---

**16.** Long Island's fiscal year ended on September 30. *See* PX 404 at LIP0083715 (Long Island Bancorp annual report (1997)).

**17.** On January 31, 1995, approximately nine months after Long Island's conversion, Mr. Fuster sent a letter to OTS requesting a waiver of the prohibition on stock repurchases within one year of conversion. Tr. 682:16 to 683:9 (Test. of Fuster); DX 1898 (Letter from Fuster to Douglas J. Cestone, Deputy Head of Corporate Activities, OTS (Jan. 31, 1995)). Mr. Fuster explained that Long Island Bancorp "and the Bank, because they cannot find acceptable product at desired yields, and even though they have declared a dividend, still have excess capital and request that this application be approved." DX 1898 at WOP776 1162–63. Long Island Bancorp's application was approved, and from fiscal year 1995 through fiscal year 1998, Long Island Bancorp carried out a stock repurchase program.

**18.** Bancorp apparently did not pay a dividend during the fourth quarter of 1998, just prior to its merger with Astoria. PX 423, Ex. D (Expert Report of Charles W. Calomiris (June 14, 2004)).

ized basis, over the IPO price of $11.50 per share. PX 423 at 12 (Report of Charles W. Calomiris (June 14, 2004)).

## ANALYSIS

### A. *Liability*

The disputed issue respecting the government's liability for breach of contract focuses on interpretation of contractual language. The government has conceded that it entered into a contract with Syosset, Hr'g Tr. 29:6–15, 34:1–15 (closing arguments on July 7, 2005). Long Island maintains that the contractual documents and circumstantial evidence demonstrate that both Syosset and Centereach entered into a contract with the government that includes, among other terms, the right of the banks to count supervisory goodwill toward regulatory capital and to amortize that goodwill over a period of forty years. Hr'g Tr. 15:19 to 19:7 (closing arguments on July 7, 2005); Plaintiffs' Post–Trial Brief ("Pls.' Br.") at 31–36; Plaintiffs' Post–Trial Reply Brief ("Pls.' Reply") at 4–8. The government denies that its contract includes the right of either Syosset or Centereach to amortize goodwill over a particular period of time, Hr'g Tr. 31:17 to 32:8, 33:5–8; Defendant's Post–Trial Responsive Brief ("Def.'s Reply") at 4–5, and it also denies that the contract obligates the United States to render performance to Centereach. Tr. 31:22 to 32:14 (opening arguments); Defendant's Post–Trial Brief ("Def.'s Br.") at 29–36; Def.'s Reply at 2–4.

#### 1. *Amortization of goodwill over a forty-year period.*

■ The documents involved in Syosset's FSLIC-assisted purchase transaction contain some ambiguity, but the circumstances surrounding the transaction manifest that the parties intended to enshrine an amortization period of forty years and that they did so in a unique and awkward but effective way. Except for Syosset's offer letter for the acquisition of Suffolk Phoenix, PX 4 at 3 (quoted in pertinent part *supra*, at 620), the contractual documents do not specify an amortization period of forty years. Rather, they refer generally to pre-FAS 72 accounting principles, push-down accounting, and Bank Board

Memorandum R–55. Section 10 of the Assistance Agreement provides in pertinent part:

> Except as otherwise provided in this Agreement, any computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied in the savings and loan industry, including the accounting principles in effect for mergers and acquisitions prior to the issuance of FASB # 72, permitting the use of "push down accounting" as noted in R Memorandum # 55 and those accounting principles used by [Syosset] prior to this Agreement ....

PX 1 § 10 (executed Assistance Agreement (Aug. 17, 1983)).

Putting aside briefly the reference to pre-FAS 72 accounting principles, the reference in Section 10 of the Assistance Agreement to "push down accounting" and Bank Board Memorandum R–55 by themselves provide an answer to the liability question. Section 17 of the Assistance Agreement, the integration clause, states in part that "[t]his Agreement and the Master Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitute the entire agreement between the parties." *Id.* § 17. The "entire agreement" included Bank Board Resolution No. 83–435, which provided:

> That not later than 90 days following the effective date of the acquisition of Centereach by [Syosset], [Syosset] and Centereach shall submit to the Supervisory Agent an opinion of independent certified public accountants that [Syosset] and Centereach have accounted for the transaction in accordance with generally accepted accounting principles, except that as herein provided by the Bank Board, for purposes of reporting to the Bank Board: (a) "push down" accounting shall be used to reflect the acquisition on Centereach's books; and (b) the cash contribution by the FSLIC to Centereach with respect to Suffolk [Phoenix] pursuant to the Assistance Agreement shall be deemed a contribution to net worth, and shall be booked as a direct credit to Centereach's net worth.

PX 2 at 11 (FHLBB Resolution No. 83–435 (Aug. 11, 1983)). In addition, Syosset and Centereach each entered into a Master Agreement with the government, which agreement required the respective bank to

> keep proper and adequate books of record and account, in which full and substantially correct entries shall be made of all dealings and transactions relating to the Certificates and the properties, business and affairs of the [bank], and such books and records shall be adequate to enable the [bank] to prepare its financial statements in accordance with generally accepted accounting principles consistently applied and in accordance with § 10 of the Assistance Agreement.

PX 104 at LIP0000210 (Section 5.5 of Centereach's Amendment to Master Agreement, Income Capital Certificates and Purchase Agreement (Aug. 17, 1983)), LIP0000495 (Section 5.5 of Syosset's Master Agreement for Issuance of Income Capital Certificates (Aug. 17, 1983)).

These documents and much of the circumstantial evidence in this case bear some similarity to the evidence involved in the Century and Ohio transactions in *Home Savings of America, F.S.B. v. United States,* 57 Fed.Cl. 694 (2003) (*"Home Savings III"*), aff'd in part and vacated and remanded in part, 399 F.3d 1341 (2005) (*"Home Savings IV"*). In that case, "[t]he Century and Ohio Resolutions did not specify an amortization period, but they did set out the process by which the amortization period would be determined." *Home Savings IV,* 399 F.3d at 1350 (citing *Home Savings III,* 57 Fed.Cl. at 704 ("Home Savings was to provide regulators with an analysis, supported by independent auditors, [that] included the proposed amortization period for supervisory goodwill arising from those transactions.")). *Cf. Fifth Third Bank of W. Ohio v. United States,* 402 F.3d 1221, 1232 (Fed.Cir.2005) ("The need to specify the exact length of the amortization period never became a relevant consideration; it got resolved by default in the later paperwork."). In the instant case, the Resolution refers to push-down accounting, and both Master Agreements incorporate the accounting treatment specified in Section 10 of the As-

sistance Agreement, which section in turn incorporates Memorandum R–55. PX 2 at 11; PX 104 at LIP0000210, LIP0000495. The Resolution thus refers implicitly to Memorandum R–55 (which established the push-down method of accounting, *see supra,* at 620 n. 6), and the Master Agreements explicitly incorporate that document. Memorandum R–55 sets out that process, and thus the transactional documents "set out the process by which the amortization period [was to] be determined." *Home Savings IV,* 399 F.3d at 1350.

Memorandum R–55 describes "[p]ush-down accounting [a]s the establishment of a new accounting and *reporting* basis" and states that such method "is acceptable for purposes of *reporting* to the FHLBB although its use is not required." PX 8 at 1 (Memorandum R–55 (Jan. 17, 1983)) (emphasis added). The memorandum describes the reporting process as follows:

> Supervisory staff encountering the use of push-down accounting should determine if it has been applied in accordance with GAAP. An opinion from an independent public accountant that both the establishment of a new basis of accounting at the time of the acquisition and the current use of push-down accounting are in conformity with GAAP, or, alternatively, an independent certified public accountant's opinion on the association's subsequent financial statements which is not qualified with respect to the use of push-down accounting should provide evidence to support this staff determination. This requirement may be satisfied at the date of completion of the regular audit covering the period during which the accounting change was made.

*Id.* at 2. Importantly, Memorandum R–55 further sets out the process for determining the period of amortization in the following way:

> In addition to assuring that an opinion as to the appropriateness of the push-down accounting applied has been rendered by the independent public accountant, sufficient specific review should be made to assure that:
>
> . . . .

2. amounts of intangible assets, including goodwill, are reasonably determined and the amortization methods and periods are justified, but, in any event, do not exceed 40 years from the date of the acquisition; ....

*Id.*

Syosset and Centereach complied with the reporting process for amortization periods set out in Memorandum R–55. Syosset's and Centereach's accountant, Peat Marwick, reviewed the accounting for Syosset's acquisition of Centereach, and in November 1983, the chairman of Peat Marwick sent Syosset and Centereach a letter opining that the transaction was accounted for in accordance with GAAP and "that push down accounting can be reflected on the books and records of Centereach." PX 9 at LIP0140600 (Letter from Peat Marwick to Conway (Nov. 15, 1983)). The banks submitted that accountant's opinion to the supervisory agent of the Bank Board, explaining that they were acting pursuant to the Bank Board's Resolution No. 83–435. *Id.* at LIP0140599 (Letter from Nacos to Vigna (Nov. 17, 1983)). Neither Peat Marwick's opinion nor the banks' letter to the Bank Board attaching that opinion specified a particular length of amortization. However, Peat Marwick also examined the banks' consolidated statements of financial condition as of September 30, 1983 and 1982, and sent them its accountants' report in December 1983. PX 117 at GTP0096971 (Letter from Peat Marwick to Syosset's board of directors (Dec. 9, 1983)). In that report, Peat Marwick stated explicitly that "[t]he excess of cost over the net assets acquired totaled approximately $625,375,000 and is being amortized on the straight-line basis over 40 years." *Id.* at GTP0096985. In May 1984, the banks submitted to FSLIC that accountants' report along with its consolidated statements of financial condition as of September 30, 1983 and 1982, explaining that it was doing so in accord with the Master Agreement. PX 118 (Letter from Nacos to David K. Schweitzer, Case Manager, Financial Assistance Division, FSLIC (May 29, 1984)). The materials submitted also included Mr. Fuster's certification of the financial statements, which he confirmed "are in accordance with generally accepted accounting principles, consistently applied and in accordance with Section 10 of the Assistance Agreement." PX 117 (Letter from Fuster to FSLIC (May 29, 1984)). The preparation of Peat Marwick's opinion on the banks' financial statements complied with the reporting requirement of Memorandum R–55, which "may be satisfied at the date of completion of the regular audit covering the period during which the accounting change was made." PX 8 at 2 (Memorandum R–55 (Jan. 17, 1983)) (paragraph quoted in full *supra,* at 634). The regulators notified the banks that they received Peat Marwick's audit report. PX 119 (Letter from Vincent A. Cerreta, Assistant District Director, Operations, Office of Examinations & Supervision, FHLBB, to Conway (June 4, 1984)). Thus, a forty-year amortization period for the goodwill was enshrined.

The peculiar, unique aspect of Suffolk's contract for the acquisition of Centereach relates to the backhanded way in which the parties established accounting treatment that *allowed* forty-year amortization of goodwill. The testimony at trial of the participants in the negotiations supports the banks' interpretation of the contract and does nothing to further the government's position in litigation of this case. Mr. Fuster, the lead negotiator for Syosset, testified that he edited an early draft of the Assistance Agreement prepared by the government's counsel, to include specific references to pre-SFAS 72 accounting as well as to push-down accounting and Memorandum R–55, because he intended to contract for the banks' ability to count goodwill as regulatory capital and to amortize that goodwill over forty years, as specified in Syosset's amended bid letter. Tr. 124:25 to 133:12 (Test. of Fuster); PX 4 at 3 (Letter from Hall to Beesley (Apr. 5, 1983)). Mr. Fuster's understanding was that the phrase he inserted into the draft Assistance Agreement referring to pre-SFAS 72 accounting was sufficient to specify an amortization period of forty years. Tr. 133:7–12 (Test. of Fuster). In this regard, he proposed these changes after Long Island's counsel received from the Bank Board a response to Syosset's amended bid letter, which response proposed a thirty-five year

amortization schedule and use of regulatory accounting principles, rather than accounting under generally accepted accounting principles. Tr. 117:3 to 118:11 (Test. of Fuster); Tr. 818:4–19 (Test. of Hall); PX 6 at 6 (Letter from Hayes to Hall (undated)). Mr. Hall, Syosset's outside counsel who participated in the negotiations, including the meeting held at the Bank Board's offices in July 1983, testified that the Bank Board's chief accountant, Robert Moore, nodded in acquiescence to these terms. Tr. 820:4 to 822:3 (Test. of Hall). The revisions proposed by Mr. Fuster thereafter were put in place and used in the final text of the Assistance Agreement.

The witnesses the government presented at trial regarding contractual interpretation supported the banks' position. In particular, Mr. Vigna, the District Director of OTS at the pertinent time, testified that at the time of his deposition in this case in 1999, he apparently understood that the parties contracted for an amortization term of forty years. Tr. 4463:11 to 4464:17 (Test. of Vigna).

The evidence thus demonstrates that the banks established through the contractual negotiations that they wanted agreement on use of a forty-year schedule for amortizing goodwill, that the government agreed, and that the contractual language reflected that agreement, albeit in a unique way. The parties' subsequent conduct is fully consonant with this finding. Subsequent to its initial consolidated financial statements and accountants' report in 1983, the banks continued submitting such materials for each of the years 1984 through 1989, in which materials the Bank consistently and continuously specified that it was amortizing goodwill over forty years. PX 125 at LIP0208091 (the banks' Consolidated Financial Statements (1984 & 1983)); PX 130 at GTP0026505 (the banks' Consolidated Financial Statements (1985 & 1984)); PX 141 at LIP197040 (the banks' Consolidated Financial Statements (1986 & 1985)); PX 145 at LIP0148359 (the banks' Consolidated Financial Statements (1987 & 1986)); PX 152 at GTP0085312 (the banks' Consolidated Financial Statements (1988 & 1987)); PX 180 at LIP0017422 (the banks' Consolidated Financial Statements

(1989 & 1988)). Moreover, FDIC and OTS conducted regular examinations of the banks subsequent to the acquisition and issued reports expressing their understanding that "[i]n accordance with a FSLIC Assistance Agreement, the goodwill was to be amortized over a forty-year period, with LISB–Centereach permitted to include the outstanding goodwill as part of capital for all regulatory purposes." DX 775 at WOQ638 0108 (OTS's report of examination of the banks (commenced Apr. 8, 1991)); PX 262 at 13 (OTS's report of examination of the banks (commenced Sept. 1, 1992)); accord DX 768 at 1 (FDIC's report of examination of Centereach (Dec. 11, 1990)); PX 227 at 8 (OTS's report of examination of Centereach (commenced Apr. 8, 1991)); DX 779 at 1 (FDIC's report of examination of Centereach (July 27, 1992)); see also PX 138 at 8 ("S Memo" from O'Connell to Jeff Sconyers; Secretary to FHLBB (Apr. 16, 1986)). At no point did the regulators object to Centereach's inclusion of its goodwill in its regulatory capital or to the amortization of that goodwill over forty years. Tr. 269:24 to 270:5, 274:6–13 (Test. of Fuster). As the trial court and the court of appeals observed in Home Savings with respect to similar circumstantial evidence, "it is unreasonable to believe that regulators would have allowed [plaintiff] to amortize supervisory goodwill over a 40 year period absent an understanding that this was the implementation of the process agreed upon in the ... Assistance Agreements." Home Savings IV, 399 F.3d at 1351 (quoting Home Savings III, 57 Fed.Cl. at 705).

### 2. Promises running to Centereach as well as Syosset.

Secondarily, the government argues "[t]he plain language of the Assistance Agreement ... demonstrates that Centereach did not have a goodwill promise." Def.'s Br. at 29. In developing this argument, the government focuses solely on the Assistance Agreement and ignores the other two primary components of the contract, the Resolution and the Master Agreements. In particular, the government observes that the term "this Agreement" in the Assistance Agreement refers only to the Assistance Agreement, to the exclusion of the "entire agreement," such that the phrase "computations made for the

purpose of this Agreement" in Section 10 of the Assistance Agreement refers only to computations required by the Assistance Agreement itself. *Id.* at 30–32; Def.'s Reply at 2. The government then notes that the only computation so required is that addressed by Section 9, providing that "[Syosset] shall cause the net worth of CENTEREACH to be maintained at" one percent for the first ten years following consummation of the transaction. Def.'s Br. at 32–34 (quoting PX 1 § 9 (executed Assistance Agreement (Aug. 17, 1983))); Def.'s Reply at 3. From these premises, the government contends that "[t]hese computations included Syosset's obligation to maintain Centereach's capital, but not any computations allowing Centereach to include goodwill in its capital." Def.'s Br. at 35; *see also* Tr. 32:12–14 (defendant's counsel at opening arguments stating that "[t]here is no provision in the [A]ssistance [A]greement that addresses Centereach's obligation itself to meet prevailing capital requirements").

The government misconstrues the pertinent terms of the Resolution and Master Agreements and ignores their relationship to Memorandum R–55 and to Section 10 of the Assistance Agreement. The Resolution specifically obligates both Syosset and Centereach to submit to the Supervisory Agent an accountant's opinion that both banks have accounted for the transaction in accordance with GAAP, including the application of push-down accounting "to reflect the acquisition on Centereach's books." PX 2 at 11 (FHLBB Resolution No. 83–435 (Aug. 11, 1983)) (provision quoted in full *supra*, at 633). That provision of the Resolution is not surprising, considering that Centereach, as the subsidiary entity, was necessarily and inherently involved in a purchase transaction applying push-down accounting. The goodwill was recorded on Centereach's books and records, not those of Syosset. *See* PX 8 (Memorandum R–55 (Jan. 17, 1983)). The government seeks to negate the import of the Resolution by asserting that "[t]he resolution imposed an *independent* obligation upon Syosset and Centereach to provide an accountant's opinion" and that "[c]onspicuously lacking in the resolution were any provisions specifically providing that, for pur-

poses of Centereach's regulatory reporting requirement, pre-SFAS No. 72 accounting would apply, a particular amortization period could be used, or goodwill would count fully as an asset." Def.'s Br. at 31–32 (emphasis added); *see also* Def.'s Reply at 5. However, far from imposing an "independent" requirement on the banks, the Resolution's use of the term "push-down accounting" for purposes of recording the goodwill on Centereach's books refers to Memorandum R–55, which sets forth precisely the provisions the government finds "[c]onspicuously lacking" in the four corners of the Resolution itself. *See supra*, at 634.

Moreover, the Master Agreements for both Syosset and Centereach require each bank "to prepare its financial statements in accordance with [GAAP] principles consistently applied and in accordance with § 10 of the Assistance Agreement." PX 104 at LIP0000210 (Section 5.5 of Centereach's Amendment to Master Agreement, Income Capital Certificates and Purchase Agreement (Aug. 17, 1983)), LIP0000495 (Section 5.5 of Syosset's Master Agreement for Issuance of Income Capital Certificates (Aug. 17, 1983)) (provision quoted in full *supra*, at 634). The government counters the natural thrust of this provision in the Master Agreements by contending that "[t]his [provision] simply means that GAAP applies, except to the extent section 10 applies different treatment to calculations that are required pursuant to the Assistance Agreement." Def.'s Reply at 2. This purported interpretation of the Master Agreements is disingenuous; Section 10 of the Assistance Agreement provides for GAAP accounting as it existed prior to SFAS 72 and specifically for the accounting treatment described in Memorandum R–55. *See supra*, at 633–35.

■ In short, the contract Syosset and Centereach entered into with the government includes Centereach's right to count its supervisory goodwill toward regulatory capital and to amortize that goodwill over a forty-year period. With the enactment of FIRREA and the adoption of regulations implementing that statute, the government breached this contract. That breach caused damages and loss to Centereach and Syosset,

as the facts and circumstances proven at trial establish, and the government is liable for those damages and losses.

## B. Damages

■ Compensation by way of an award of money damages to the injured party is the primary means of remedying a breach of contract. 24 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 64:1, at 4–5 (4th ed.2002) (hereafter *"Williston"*). Expectancy damages, the amount representing the benefit to the non-breaching party had performance been rendered, ordinarily provides the basis for an award of contractual damages. *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003); *Restatement (Second) of Contracts* § 344 & cmt. a (1981); *Williston* § 64:2, at 30. A plaintiff is entitled to an award of expectancy damages upon showing by a preponderance of the evidence that such damages were proximately caused by the breach, that they were actually foreseen or reasonably foreseeable, and that the amount can be estimated with reasonable certainty. *La Van v. United States*, 382 F.3d 1340, 1351 (Fed.Cir.2004).

■ Expectancy damages are often measured by the amount of profits lost but also include any other losses caused by the breach, including incidental losses. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) (citing *Restatement (Second) Contracts* § 347); *Williston* § 64:2, at 30. "Incidental losses include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction." *Restatement (Second) Contracts* § 347 cmt. c; *see also Williston* § 66:55–56, at 664–677.

### 1. Cost of replacement capital.

#### a. Causation.

■ The banks have demonstrated that their efforts toward replacing Centereach's supervisory goodwill with tangible capital "w[ere] a direct consequence of the breach." *LaSalle Talman*, 317 F.3d at 1373–74. As the Federal Circuit noted in *LaSalle Tal-*

*man*, "precedent distinguishes between remote consequences of contract breach, whether favorable or unfavorable to the non-breaching party, and those that are directly related to or direct consequences of the breach.... [R]eduction of loss through a substitute transaction is generally a direct mitigation of damages." *Id.* at 1373. Consequences of the breach that are unfavorable to the injured party are recoverable as damages, whereas any favorable consequences must be credited against damages, *see, e.g., LaSalle Talman*, 317 F.3d at 1375, provided that the causal connection between the breach and such consequences has been "definitely established." *California Fed. Bank v. United States*, 395 F.3d 1263, 1268 (Fed.Cir. 2005) (internal quotation and citations omitted).

The banks sought to mitigate the loss due to the breach, *i.e.*, the loss of regulatory capital in the form of amortizable goodwill, by a three-step approach, all three steps of which were "directly related to or direct consequences of the breach." *LaSalle Talman*, 317 F.3d at 1373. First, because upon enactment of FIRREA Centereach immediately failed the minimum capital requirements imposed by FIRREA, Centereach was required to submit to OTS a capital plan demonstrating how it would meet those requirements by December 31, 1994, as specified in OTS's Thrift Bulletin 36. DX 292 at LIP134539 (Letter from Vigna to Centereach's board of directors and managing officer attaching copies of Thrift Bulletins 36 and 36–1 (Dec. 18, 1989)). Pursuant to Centereach's capital plan filed in October 1990, Syosset made capital contributions to Centereach through 1994. PX 13 at 32–34 (Capital Plan for Centereach (Oct. 25, 1990)). Those direct capital contributions amounted to approximately $9 million. PX 13 at 31 (Syosset to make direct capital contributions to Centereach of $2 million per year during the capital-plan period). However, in a departure from the regimen contemplated by Thrift Bulletin 36, the capital plan stated that Centereach would "determine later the precise further actions to be taken in 1994 (or thereafter), depending on the economic, regulatory, legal and other circumstances at the time." *Id.* at 42. The capital plan for Cen-

tereach thus did not lay out a specific path or paths to attaining capital compliance. OTS's approval of the capital plan in such circumstances was highly unusual, if not unique. As James Caton, the Deputy Assistant Director of Special Supervision of OTS who reviewed Centereach's capital plan, testified, Centereach was "one of the very few, if not the only, thrift which did not project capital compliance by the end of 1994." Tr. 3296:15–17 (Test. of Caton); *see also* Tr. 3289:22 to 3291:3 (Test. of Caton). Mr. Caton explained that OTS made an exception for Centereach because among other reasons, "[t]he current management team was very strong. They were sterling, and we had a lot of confidence in them." Tr. 3314:6–7 (Test. of Caton); *accord* 3291:4–22 (Test. of Caton); *see also* Tr. 3288:23 to 3289:4 (Test. of Caton). The banks consistently were making money and retaining earnings during the capital-plan period, and they ultimately used all of those retained earnings to reduce Centereach's capital deficit.

The banks' second step in mitigation of the government's breach was their restructuring plan. The banks had strongly resisted consolidation, DX 317 (Internal mem. from Ruth Ann Popielarski to the files (May 1, 1990)); PX 208 (Letter from Viklund to Vigna supplementing meeting held on April 27, 1990 (May 1, 1990)); PX 11 (Internal mem. from Kehoe to the files (May 8, 1990)), and OTS had backed away from requiring the banks to merge in 1990, *see supra* at 624, but the banks eventually adopted a restructuring plan that projected achievement of minimal capital adequacy by way of a sale of assets, branches, and deposits, followed by a merger and write-off of goodwill. PX 14 at GTP0057159, GTP0057162–63 (Bear Stearns's presentation on restructuring alternatives (Nov. 19, 1992)); PX 283 at LIP0119463–64; LIP0119469 (Minutes of Centereach's board of directors meeting (Nov. 19, 1992)); DX 1657 (Letter from Viklund to Vigna (Nov. 23, 1992)). The restructuring plan was approved by OTS, *see supra*, at 626, and implementation of this restructuring plan produced favorable results. In effect, the restructuring plan reduced the size of the banks by approximately $1.0 billion and correspondingly reduced the amount of tangible capital the banks had to have. With the merger, Syosset used its retained earnings to fill Centereach's capital deficit. As a consequence, Centereach was released from its capital plan. PX 332 (Letter from Vigna to Long Island's board of directors (Sept. 3, 1993)). However, the banks' actions in mitigation thus far had resulted in minimal capital compliance on a consolidated basis. Tr. 369:6–12 (Test. of Fuster); PX 520 (Demonstrative showing tangible capital ratios before and after restructuring). Additionally, as FDIC opined, the restructuring plan resulted in the unfavorable consequence that "the Bank had to sell some high earning and good assets," PX 16 at 9 (Long Island's board of trustees meeting (Oct. 26, 1993)), causing FDIC to·rate the merged Bank as a "3" on the MACRO scale, putting its capitalization category in jeopardy for the future. PX 15 at GTP0056285 (FDIC's report of examination of Long Island (commenced July 6, 1993)); *see also* PX 16 at 9. The Bank sought to address its higher proportion of nonperforming and underperforming assets by way of the Bulk Sale and sale of real estate owned. PX 391 at GTP0083019 (Long Island Bancorp's annual report (1994)).

Long Island's third and final mitigating substitute transaction was its conversion and issuance of stock through a "community" initial offering, through which it succeeded in raising from its depositors tangible capital sufficient to replace the remainder of the lost goodwill and to restore the regulatory capital position to the level it had been before FIRREA, albeit with a 20% smaller bank. *See supra*, at 630–31. The Bank's conversion was directly related to restoring its capital cushion, the loss of which was a direct consequence of the government's breach.

The government contests the second and third of the three mitigating steps. Presumably, it did not contest the bank's actions under the first mitigating step, the capital-plan period, because the banks sought no damages respecting that step. With respect to the bank's second step of mitigation, the restructuring plan, the government argues that the sale of branches and deposits was "not caused by the breach, but, rather, w[as] the product of an independent business deci-

sion, ... [*viz.,*] to position [the Bank] to convert." Def.'s Br. at 40. In this regard, the government hypothesizes that Centereach "could have been relieved of the restriction of the Capital Plan and met all of the capital requirements of both FIRREA and FDICIA by merely consolidating ... as early as January 1993" without shrinking. *Id.* As the court of appeals and this court have observed in similar circumstances, "[t]he clear import of the government characterizing its argument as one of causation is to avoid the reasonability element of the mitigation doctrine," *First Heights Bank, FSB v. United States,* 422 F.3d 1311, 1317, 2005 WL 1962989, at *4 (Fed.Cir.2005); *see also Cuyahoga Metro. Hous. Auth. v. United States,* 65 Fed.Cl. 534, 544–45 & n. 14 (2005) (discussing *Franconia Assocs. v. United States,* 61 Fed. Cl. 718, 750 (2004), and citing *Globe Sav. Bank, F.S.B. v. United States,* 65 Fed.Cl. 330, 347–49 (2005), and *Long Island Sav. Bank, FSB v. United States,* 60 Fed.Cl. 80, 90 (2004)), because the breaching party bears the burden of proving that the actions taken by the injured party are unreasonable, whereas the injured party has the burden of proving causation. *Globe Sav.,* 65 Fed.Cl. at 348; *see also First Heights,* 422 F.3d at 1316, 2005 WL 1962989, at *4.[19]

The government's position is grounded on the premise that because Syosset and Centereach in practice operated in tandem, the court should treat them on a consolidated basis. *See* Def.'s Br. at 40. In this regard, defendant argues that the banks would have been in capital compliance *on a consolidated basis* prior to the branch sale, and thus that the banks' reason for entering that transaction could not have been caused by their desire to achieve compliance. *Id.* The government's argument assumes too much. As in other recent cases in this court, "[t]here were no grounds offered here to 'pierce' the corporate veil on the theory that [the subsidiary] is not an independent entity." *LaSalle Talman Bank, F.S.B. v. United States,* 64 Fed.Cl. 90, 114 (2005). Furthermore, the contemporaneous evidence demonstrates that the regulators did not treat the banks on a consolidated basis for purposes of capital compliance. For example, OTS warned *Cen-*

*tereach* three days after the prompt-corrective-action provision of FDICIA took effect that *Centereach* was "critically undercapitalized." PX 293 (Letter from Vigna to Centereach's board of directors (Dec. 22, 1992)). Moreover, the government is wrong that the banks could have achieved capital compliance without selling branches and about $1 billion in deposits. In developing the restructuring plan, the banks' advisor, Bear Stearns, had analyzed the option of selling assets to realize a gain sufficient to allow the banks to avoid branch sales. DX 926 at 9 (Presentation by Bear Stearns to the banks' Special Committee (Sept. 29, 1992)). They had concluded that the banks would have to sell $3.7 billion in assets, *id.,* that the banks would achieve a 3.99% tangible-capital ratio, *id.* at PLI169 1581, but that the banks would immediately begin to show significant and recurring operating losses because they would have sold off virtually all of their higher earning assets. *See supra,* at 627, and *infra* at 642.

The government further presses this point by referring to Bear Stearns's presentation to the banks' board given in September 1992, and asserting that the "entire thrust ... was the potential conversion of [Long Island] to a stock institution." Def.'s Br. at 40 n.10. The government is correct only insofar as Bear Stearns's presentation identified "the potential for conversion to stock form" as one of several "restructuring/recapitalization alternatives." DX 926 at 13. It otherwise is wrong. OTS, not Long Island, was requesting that consideration of a conversion plan occur at an appropriate time. As Mr. Caton of OTS testified, one of the reasons OTS rejected Centereach's initial capital plan was that the plan "seemed to have ruled ... out for the time being" a "mutual[-]stock conversion" as a potential restructuring alternative. Tr. 3296:5 to 3297:21 (Test. of Caton). Mr. Caton further explained that "in OTS's view, we thought that the conversion of Long Island Savings Bank from mutual to stock ownership was a viable alternative, which should be continually explored by management." Tr. 3312:22–25 (Test. of Caton). Conse-

---

19. The government's arguments questioning the reasonableness of the banks' efforts to mitigate the breach are addressed in detail *infra,* at 642–44.

quently, prior to approving the second capital plan Centereach submitted, Mr. Caton and other OTS regulators, "[u]pon further discussions with Centereach, . . . were able to work out some modifications to the early capital plan," including "[i]nfusions from Syosset into Centereach, capital infusions, as well as management's commitment and promise to continually explore capital-raising strategies, such as conversion[;] mutual[-]stock conversion was the primary one." Tr. 3304:15–22 (Test. of Caton).

The evidence presented at trial demonstrates that the banks designed their restructuring plan to address their capital deficiency in 1992 and 1993, not to prepare for a public offering. Mr. Singer, for example, explained that at the time the banks' Restructuring Committee was creating its plan, "[w]e had no desire to go public. Our desire was to solve our capital problem and grow the company and manage it, as we had managed it for a number of years." Tr. 1355:15–17 (Test. of Singer); *accord* Tr. 1355:18 to 1357:5 (Test. of Singer). Messrs. Viklund and Conefry further elaborated that the board was not considering a public offering in the Fall of 1992, because the merged entity would have been only minimally capital compliant and its stock would not have been marketable. Tr. 1079:25 to 1082:11, 1215:24 to 1218:13 (Test. of Viklund); Tr. 1435:14 to 1436:10 (Test. of Conefry). The testimony of these witnesses is confirmed by the minutes of the Restructuring Committee's meeting on

August 24, 1992, at which the Committee deliberated over which investment banking firm to select for advice on restructuring alternatives. Among the reasons the Committee declined to select Sandler O'Neil was that "[t]hey focused more on going with a public offering than a restructuring as we proposed it." PX 260 at 4 (Minutes of Restructuring Committee's meeting (Aug. 24, 1992)).

Regarding the Bank's third step of mitigation, the conversion and IPO, the government contends that Long Island would have converted at about the same time regardless of the breach. Def.'s Br. at 53–54; Def.'s Reply at 6–7.[20] Defendant additionally argues that the Bank converted in the "breach world" for independent business reasons, including a desire to compete with thrifts having higher levels of tangible capital. Def.'s Br. at 54–56. In contending that proximate causation cannot be established in these circumstances, the government is really arguing yet again that Long Island's mitigation was unreasonable. It, not Long Island, has the burden of that demonstration, and the government has not satisfied that burden. It simply would not have been possible for the Bank to have operated in the Long Island area at a minimal level of capital compliance. Some cushion was necessary for any bank to operate in that marketplace, and the cushion Long Island eventually achieved was entirely reasonable. *See infra,* at 643–44.[21] In short

---

**20.** Defendant also erroneously asserts that Long Island "acknowledges" that Syosset would have contributed its retained earnings to Centereach at around the same time regardless of the breach. Def.'s Reply at 7. The government cites to testimony of Dr. Baxter, one of plaintiffs' experts, for support for this proposition. *See id.* (citing Tr. 2552:11–19 (Test. of Baxter)). However, that testimony relates only to conversion, not to use of retained earnings. *See* Tr. 2552:11–19 (Test. of Baxter).

As to conversion, Dr. Baxter testified that "had there been no breach, a conversion would have taken place at approximately the same time." Tr. 2359:1–3 (Test. of Baxter). This testimony seems to have been based upon Dr. Baxter's assessment of when the capital markets might have been receptive to an IPO for a thrift rather than an evaluation of the banks's particular circumstances. In this vein, Dr. Baxter testified that he did not believe the banks could have attained capital compliance absent the restruc-

turing, *see* Tr. 2359:21 to 2361:5 (Test. of Baxter), and he also testified that the level of tangible capital achieved by the banks as a consequence of the restructuring, including the merger, was in the view of the banks' management insufficient for operation with comfort. Tr. 2473:2 to 2476:25 (Test. of Baxter). In all events, Dr. Baxter had no first-hand knowledge of the banks' plans and actions.

**21.** Moreover, as the Federal Circuit has explained, the causal connection between the breach and damages must be "definitely established" but that "is not to say that the breach must be the sole factor or sole cause [of the damages]. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *California Fed.,* 395 F.3d at 1268. Before the breach, the board operated the banks at a capital cushion near 8% for business reasons, and the board desired to operate Long Island at the same

Long Island has established causation. It's efforts in raising capital through a conversion and community offering of stock to replace its lost goodwill and rebuild its pre-FIRREA capital cushion was a direct action in mitigation of the breach.

### b. *Forseeability.*

The banks have also proven that the damages they incurred in connection with raising replacement capital were foreseeable. The government responds that the third stage of Long Island's mitigation, its conversion, was not foreseeable because Centereach's capital plan allowed it "to achieve capital compliance through normal operations." Def.'s Br. at 60. Defendant again ignores that it bears the burden of proof that Long Island's mitigation was unreasonable, as well as the importance to Long Island of a capital cushion. The court of appeals in *Home Savings IV* explained that

> the regulators undoubtedly would have understood that when they promised to allow supervisory goodwill that taking away this inducement would cause [plaintiff] to "re-evaluate [its] capital ratio[ ]" and "take on replacement capital." *Home III,* 57 Fed. Cl. at 726. As the government's regulators were aware of [plaintiff's] practice of maintaining a conservative capitalization ratio, the government in this case should have expected [plaintiff] to seek to restore that ratio after the passage of FIRREA.

399 F.3d at 1355. In the instant case too, it was foreseeable that Long Island would raise tangible capital to restore its capital position.

### c. *Mitigation.*

■ A party injured by a breach of contract has a duty to mitigate damages. As the *Restatement (Second) Contracts* provides, "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." *Restatement (Second) Contracts* § 350(1).

In other words, " 'a party cannot recover damages for loss that he could have avoided by *reasonable efforts.*' " *Indiana Michigan Power Co. v. United States,* 422 F.3d 1369, 1375, 2005 WL 2173563, at *4 (Fed.Cir.2005) (quoting *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed.Cir.2002), and *Restatement (Second) Contracts* § 350 cmt. b). *See also Tennessee Valley Auth. v. United States,* 60 Fed.Cl. 665, 674 (2004) ("When it became obvious to [plaintiff] that [the government] would not perform under the contract, [plaintiff] was justified, indeed obligated, to take steps to minimize its losses in light of [the government's] imminent non-performance.").

■ It is the breaching party's burden to prove that the injured party's actual actions taken in mitigation were unreasonable. *Globe Sav.,* 65 Fed.Cl. at 348 (citations omitted). *See also First Heights,* 422 F.3d at 1316–17, 2005 WL 1962989, at *4. The banks' mitigation during the capital-plan period prior to the restructuring is not relevant to this contention because the banks did not seek damages for their replacement of Centereach's goodwill via Syosset's capital contributions to Centereach at that time or to Centereach's retention of earnings during that period. However, the government challenges the banks' actions in mitigation during the restructuring and the conversion as being unreasonable even though the actions proved to be successful.

■ The contemporaneous evidence presented at trial proves that the restructuring plan was a reasonable step in mitigating the loss of goodwill as regulatory capital. As noted *supra,* at 640, the government does not contest that the banks needed to sell assets as part of the restructuring. Rather, the government focuses on the banks' sale of branches and deposits. In developing a restructuring plan for Centereach, Messrs. Fuster and Singer considered merging the banks without shrinking them first, but they

level. *See supra,* at 623, 630–31. Here, as in *Home Savings III,*
 [t]he evidence is clear that, had FIRREA not disallowed the use of supervisory goodwill, [plaintiff] would have raised less capital, in the amount of that disallowed supervisory goodwill. The cost of raising that capital is thus a direct result of the government's breach.

 There is nothing remote or consequential about these damages. Plaintiffs have isolated costs related only to the capital raised to replace supervisory goodwill. That [plaintiff] had other reasons to raise capital is immaterial.
57 Fed.Cl. at 727 (citations omitted).

rejected that alternative because it was unreasonable to consume Syosset's capital in that effort when the resulting bank would still be undercapitalized. Tr. 344:25 to 345:8 (Test. of Fuster). This decision was confirmed by Bear Stearns's restructuring analysis and presentations. As Bear Stearns's September 1992 presentation to the banks' Special Committee explained, "deposits must be sold to reach targeted capital levels." DX 926 at 13 (presentation by Bear Stearns to the banks' Special Committee (Sept. 29, 1992)). Similarly, in another presentation on restructuring alternatives two months later, Bear Stearns told the board that the bank would be "significantly undercapitalized" absent a sale of branches. PX 14 at GTP0057159 (Presentation on restructuring alternatives (Nov. 19, 1992)). In particular, Bear Stearns projected that if no assets or branches were sold and no goodwill were written off, Long Island would have had at September 30, 1993 a tangible capital ratio of only 3.09%. DX 926 at 9–10. In addition, Bear Stearns calculated that Long Island would have had to sell $3.7 billion of assets to realize an amount of embedded gain sufficient to avoid selling branches. *Id.* at 9; Tr. 5587:24 to 5588:25 (Test. of Fuster). In that scenario, Long Island would have a 3.99% tangible capital ratio at September 30, 1993 and would not have been adequately capitalized under FDICIA. DX 926 at 10; Tr. 5589:1–24 (Test. of Fuster). Moreover, under that scenario, Long Island's future earning capacity would be impaired and its tangible capital in future years would have shrunk below even this undercapitalized level. Projections indicated that Long Island would have incurred a loss of $25.3 million in the 1993 fiscal year and a $20.4 million loss in the 1994 fiscal year. DX 926 at 10; Tr. 5589:25 to 5590:9 (Test. of Fuster).

The government has also failed to prove that Long Island's mitigation in the form of a conversion was unreasonable, for reasons that mirror those explained by the court of appeals in *Home Savings IV*. In that case,

> Ahmanson[, the parent company,] was entitled to raise funds to replace the supervisory goodwill Home[, Ahmanson's wholly owned subsidiary,] lost as a result of the government's breach. The duty of reasonable mitigation did not require Ahmanson simply to operate Home with a smaller capital cushion. As a conservatively run thrift, Home relied on a substantial cushion, and this prudence both appealed to Ahmanson's investors and helped Home gain regulatory approval to acquire failing thrifts. *Home III*, 57 Fed.Cl. at 727. Home was not required to abandon this successful business strategy merely to reduce the government's exposure. Rather, Ahmanson was entitled to cover the loss of supervisory goodwill by private capital financing in order to maintain its conservative approach.

399 F.3d at 1353.[22] As specified in Long Island Bancorp's prospectus issued in connection with the stock sale for the conversion, the holding company intended to downstream proceeds to the Bank in an amount sufficient for the Bank to achieve an 8% tangible capital ratio. DX 606 at 34 (Long Island Bancorp, Inc.'s Prospectus (Feb. 14, 1994)). The bank carried through with that statement of intention. *See supra*, at 631. The key question is whether the cushion reflected in that ratio was unreasonably large.

An expert witness retained by the government, W. Barefoot Bankhead, opined at trial that a capital level of 6% would have been prudent for Long Island and that a tangible-capital level in the 6.5%–8% range would have produced excess capital. Tr. 5633:25 to 5634:22 (Test. of Bankhead). Another of the government's expert witnesses, Dr. Andrew

---

**22.** This language in *Home Savings IV* squarely refutes the government's assertion that Long Island "had an obligation to mitigate the effects of the breach in the least costly manner to the defendant." Def.'s Br. at 59 n. 23. For purported support for its assertion, defendant cites to *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed.Cl. 64, 103 (1999), and *Bank United of Texas, FSB v. United States*, 50 Fed.Cl. 645, 654 (2001).

These cases do not provide such support. Rather, the court in *LaSalle Talman* merely observed that "it is particularly inappropriate to resort to a hypothetical and unreasonably expensive method of replacing capital when the record shows the actual method of mitigation chosen." *LaSalle Talman*, 45 Fed.Cl. at 103. Similarly, nothing in *Bank United* comes close to the meaning the government ascribes to it.

S. Carron, also testified that an 8% capital ratio was more than Long Island needed as a cushion. Tr. 5297:24 to 5298:5 (Test. of Carron). In Dr. Carron's view, the banks' pre-FIRREA capital ratio did not constitute in economic terms a "revealed preference" for a capital ratio because the parent, Syosset, was a mutual association, and thus the banks had limited means of adjusting their capital ratio. Tr. 5092:12 to 5096:11 (Test. of Carron). "As a captive of its mutual parent," the government asserts, "Centereach had no choice but to possess the cushion that it had at the time of the alleged breach." Def.'s Br. at 57. Defendant contends that once Long Island converted, it no longer needed such a high capital ratio because, as its conversion business plan stated, it did not plan to grow beyond net interest credited or to acquire branches or open *de novo* branches. *Id.* at 57–58.

The government overlooks the benefits of increased capital. Such benefits are not limited to those associated with leveraging but rather, as Merrill Lynch advised the Bank prior to its conversion, "[i]ncreased capital provides greater operating flexibility and a cushion against unanticipated losses." PX 331 at LIP0155255 (Merrill Lynch's presentation to Long Island (Sept.1993)). As Mr. Fuster testified, those are the reasons he "wanted the [B]ank to have at least an 8 percent capital ratio going into its new existence as a public company. The IPO document [Prospectus] shows us at that 8 percent number, and the bank operated historically at that and wanted to continue at that level." Tr. 5580:12–16 (Test. of Fuster).

Moreover, neither Mr. Bankhead nor Dr. Carron conducted a peer analysis comparing Long Island's capital ratio to that of comparable institutions. *See* Tr. 5306:17 to 5307:5, 5308:2 to 5309:3 (Test. of Carron); Tr. 5643:9 to 5644:2 (Test. of Bankhead). Telling evidence of the capital ratios of peer banking firms is present, however, in the record. The appraisal for Long Island prepared by RP Financial identified peer thrifts and indicated that the average capital ratio for peer

institutions as of September 30, 1993 was 9.3%, PX 354 at 3.4 (Conversion Valuation Appraisal Report (Dec. 17, 1993)), significantly *above* the 8% target for a capital ratio that Long Island sought and achieved. Still further, another expert witness who testified on behalf of the government, Professor Haluk Unal, prepared an analysis that demonstrated that the average tangible-capital ratios for converting thrifts in his sample was 7.94% in 1993 and 8.25% in 1994. DX 3062 (Demonstrative showing amount of tangible net worths of converting thrifts (Mar. 7, 2000)); Tr. 5667:23 to 5668:21 (Test. of Unal). Based on these data, Long Island's targeted capital cushion of 8% was well within the range of those of its peers at the pertinent time.

In short, the government has failed to carry its burden to prove that Long Island's efforts to mitigate the loss of goodwill as regulatory capital and regain an 8% capital ratio were unreasonable.

### d. *Reasonable certainty.*

■ Professor Charles W. Calomiris prepared a model to measure the costs incurred by the banks attendant to their replacement of supervisory goodwill with tangible capital. Professor Calomiris developed a schedule of such replacement capital based on the use for this purpose of the retained earnings from Syosset absorbed upon its merger into Centereach on September 3, 1993, and on the IPO proceeds downstreamed by Bancorp to Long Island in April 1994. Tr. 2600:7–13 (Test. of Calomiris). He started with a goodwill balance of $435,051,000 in Centereach as of September 3, 1993, amortized on a straight-line basis at a rate of $14.5 million per year. Tr. 2601:3 to 2602:6 (Test. of Calomiris); PX 755 (Demonstrative showing amortization of contractual goodwill); PX 423 (Calomiris's Report (June 14, 2004)), Ex. F (Long Island's schedule of replacement capital).[23] He also determined that the banks were targeting a capital ratio of 8% on average both prior to and subsequent to FIRREA. Tr. 2607:16 to 2612:4 (Test. of

---

23. Given this starting point, Professor Calomiris ignored the cost of replacement capital attributable to Centereach's retained earnings during the capital-plan period and to the cost of Syosset's

cash contributions of approximately $9 million to Centereach's capital during that period. *See supra,* at 638–39.

Calomiris); PX 757 (Demonstrative showing Centereach's and combined entity's quarterly regulatory capital ratios); PX 758 (Demonstrative showing Syosset's quarterly regulatory capital ratios).

Next, Professor Calomiris calculated that the dividends of $66.3 million Long Island paid to Bancorp from April 14, 1994 through the merger with Astoria on September 30, 1998, resulted in an annual cost of 9.06% over the period of 4.46 years. Tr. 2632:10–19 (Test. of Calomiris); PX 423, Ex. G (Long Island's cost of replacement associated with the $164 million of downstreamed IPO proceeds). He also used that same annual cost of capital, 9.06%, to compute the cost of capital for the period from October 1, 1998 through 2023, by which time all of the regulatory goodwill would have been amortized, Tr. 2651:14–19 (Test. of Calomiris), and he used that same rate to calculate an imputed cost of the retained earnings. Tr. 2660:20 to 2661:1 (Test. of Calomiris).

To replicate the benefits of the replacement capital over the nearly thirty years remaining on the life of the goodwill at the 1993 starting date for his calculations, Professor Calomiris selected the yield on a 30–year Treasury bond. Tr. 2643:1–15 (Test. of Calomiris). The 30–year Treasury rate on the date of Long Island Bancorp's IPO was 7.29%. PX 423 at 13. To account for the effect of taxes on the earnings from 30–year Treasury securities, Professor Calomiris used data provided via testimony by Anthony DiConstanzo, Astoria's tax manager, to calculate the tax rate for each year based on the

marginal tax rates that Long Island paid and that Astoria paid or was projected to pay. Tr. 5384:20 to 5385:4 (Test. of Calomiris); PX 822 (Demonstrative showing Long Island's tax rates on U.S. Treasury income). For each year, he then computed the benefit received from the replacement capital, based upon the amount of goodwill replaced, the 7.29% yield for the 30–year Treasury, and the applicable tax rate.

From these calculations, Professor Calomiris determined net costs the banks incurred in connection with raising replacement capital. Professor Calomiris calculated these costs in several segments. He calculated the net costs of the IPO proceeds as amounting to $139,278,000, with the costs prior to September 30, 2005 on an undiscounted basis and the future costs, i.e., those after that date, on a discounted present-value basis as of September 30, 2005. PX 821A, Exs. E, G, H.[24] For the retained earnings, he calculated that the net costs amounted to $113,185,000, again on the basis of undiscounted costs prior to September 30, 2005 and therefore on a discounted present-value basis as of September 30, 2005. PX 821A, Exs. E, I. Thus, the total net costs on an undiscounted basis prior to September 30, 2005, and thereafter on a present-value basis discounted to September 30, 2005, as measured by Professor Calomiris, equaled $252,464,000. Tr. 5387:2–4 (Test. of Calomiris); PX 821A, Ex. E.

The government raises several arguments directed at particular aspects of Professor Calomiris's cost-of-replacement model.[25]

---

**24.** Professor Calomiris testified that his revised calculation set out in PX 821A reflected actual net costs of replacement capital for each year up to September 30, 2005, the close of Long Island's fiscal year closest to the conclusion of the trial, and for years after that date, a discounting of the projected net costs by year back to September 30, 2005. Tr. 5386:15–17; Tr. 5389:8 to 5390:10; Tr. 5392:2–7 (Test. of Calomiris). This methodology as ultimately used by Professor Calomiris accords with the Federal Circuit's decision in *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1330 (Fed.Cir.2002) (*"Energy Capital II"*).

In earlier calculations, Professor Calomiris discounted net costs of replacement capital back to 1989, the date of the breach, *see* PX 422 at 11 (Report of Charles Calomiris (April 21, 2003)), or back to September 30, 1998, after the merger

with Astoria, *see* PX 423 at 4 (Report of Charles Calomiris (June 14, 2004)), or to September 1993, the date of Syosset's merger into Centereach. *See id.* at 16–18. For these prior calculations, Professor Calomiris used dates for his discounting calculations that were requested by counsel. Tr. 2654:20 to 2656:9, Tr. 2949:15–22 (Test. of Calomiris).

**25.** The government also makes its perennial argument in *Winstar*-related litigation that transaction costs represent the only costs associated with raising capital. Recognizing that the Federal Circuit has consistently rejected that argument, *see, e.g.*, *LaSalle*, 317 F.3d at 1374–75; *Home Savings IV*, 399 F.3d at 1354, the government asserts that the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo,* —— U.S. ——, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005),

Those arguments largely ignore the decisions of the court of appeals in *LaSalle* and *Home Savings IV*, and persuasive decisions of this court.

First, the government argues that Professor Calomiris's calculation of the costs of retained earnings "includes hypothetical dividends." Def.'s Br. at 65. Syosset merged into Centereach, and Syosset thus contributed its retained earnings; those retained earnings were essential to keep the merged entity afloat. In that regard, the depositors of both institutions received inchoate rights to the retained earnings and to future capital appreciation, realizable particularly upon conversion. When conversion occurred less than a year after the merger, the depositors responded to the public offering by oversubscribing to the "super maximum," recognizing the embedded value in the franchise in the form of retained earnings, strong capacity for future earnings, high-quality management, and prime location. The depositors bought all of the stock newly purchased at conversion (90% of the converted entity's total stock issuance), essentially keeping intact their equitable (and now legal) ownership of the retained earnings. The other 10% of the shares were issued for the Bank's newly created employee stock option plan and its management retention plan, so no "outsiders" were involved in the transaction. The retained earnings thus had significant value, and the stockholders (prior depositors) had every expectation of a return on them as well as on their newly paid-in capital. That return was realized upon the merger with Astoria in the form of capital gains of 38% on an annual basis. *See supra*, at 632. The shareholders did not have a right to any particular rate of return on the retained earnings, just as they had no right to a particular dividend rate on their stock.

However, they certainly had an expectation of a return on the retained earnings, just as they had an expectation of a dividend on their stock. In short, in the particular circumstances of this case, the retained earnings had a recognizable and substantial value, the equitable rights to those retained earnings inhered in the depositors who became the shareholders in the Bank, and those shareholders within a relatively short time realized value from their right to the retained earnings. Although it would not be appropriate to recognize as a cost of replacement capital the entire 38% annual return that the shareholders realized, it would be appropriate to recognize approximately one-quarter of that annual return, 9.06%, as an imputed cost of the retained earnings. In these circumstances, it is appropriate to apply the dividend rate of 9.06% both to the newly paid-in capital and to the retained earnings.

Second, the government raises a related but somewhat contradictory argument that Professor Calomiris's model "overstates the cost of capital because it fails to account for the fact that the earnings from which the dividends were paid during the 1993–98 time period were facilitated not only by the $164 million in down-streamed IPO proceeds but also by the $271 million in tangible capital that was already there at the time of conversion." Def.'s Br. at 66. Unlike the circumstances in *LaSalle Talman*, however, Long Island "paid 100% of its dividends on 100% of its outstanding stock, all of which was acquired in exchange for $164 million in IPO proceeds." Pls.' Reply at 22; *see also LaSalle Talman*, 64 Fed.Cl. at 112.

Third, the government argues that a portion of the dividends the Bank paid to Long Island Bancorp reflects a return "of" capital

"establishes" that the court of appeals in *Home Savings* and *LaSalle* "erred in affirming the rejection of the transaction-costs measure." Def.'s Br. at 60. *Dura Pharmaceuticals* is inapposite to a measurement of the costs of replacing supervisory goodwill with tangible capital. In *Dura Pharmaceuticals*, the Supreme Court held that in a securities fraud action, an inflated stock price does not by itself prove a causal connection between a material misrepresentation of the stock and a shareholder's loss. *Dura Pharm.*, 125 S.Ct. at 1632–33. The government reasons that

"*Dura Pharmaceuticals* contradicts ... [t]he approach adopted in *Home Savings* and *LaSalle* [, which] bases damages upon the happenstance of any post-issuance divergence between the expected values of the dividends and the return on the new capital." Def.'s Br. at 61. To the contrary, as plaintiffs observe, the divergence manifested in measurements of costs of replacement capital results not from happenstance but from the reality that supervisory goodwill has no capital costs, whereas tangible capital does have such costs. *See* Pls.' Reply at 19.

rather than a return "on" capital. Def.'s Br. at 67 (citing *LaSalle II,* 64 Fed.Cl. at 111). In particular, the government points to Mr. Fuster's letter of January 31, 1995 requesting a waiver of the prohibition on repurchases of stock within one year of conversion. *Id.* at 67–68 (citing DX 1898 (Letter from Fuster to Douglas J. Cestone, Deputy Head of Corporate Activities, OTS (Jan. 31, 1995))). However, the proposed buyback referred to capital held at the holding company level, not capital at the Bank. The holding company, Bancorp, had retained $100.4 million of the newly paid-in capital, and it was that capital retained at the Bancorp level that was used to buy back stock, not the capital that Bancorp had downstreamed to Long Island.

Fourth, defendant contends that Professor Calomiris's calculation of benefits is hypothetical because Long Island did not actually invest in U.S. Treasuries. Def.'s Br. at 68; *see also* Def.'s Reply at 10. However, Professor Calomiris explained that a 30–year Treasury represents the only asset that could replicate the characteristics of the remaining life of Long Island's goodwill. Tr. 2643:1 to 2644:24 (Test. of Calomiris). In similar circumstances, the court of appeals in *Home Savings IV* determined that an offset based on "the rate paid for a comparable government-backed asset" " 'account[s] for the difference between what was lost and what was substituted.' " 399 F.3d at 1354 (quoting *Home Savings III,* 57 Fed.Cl. at 723). In addition, Long Island actually owned U.S. Treasury securities in significant quantities, totaling approximately $147 million as of September 30, 1994, so Professor Calomiris's calculation of benefits in this instance is supported by the Bank's circumstances, even though the Treasury securities held by Long Island undoubtedly were not 30–year obligations. PX 391 at 44 (Long Island Bancorp, Inc.'s annual report (1994)).

The government's fifth argument is that plaintiffs' "model is nothing more nor less than a purely mathematical formula that calculates the profits that could have been earned on the goodwill had it been leveraged." Def.'s Br. at 68; *see also* Def.'s Reply at 11. This contention is wrong. Professor Calomiris's model does not purport to measure damages from leveraging. As in *Home Savings IV,* "[h]ere, the plaintiffs do not seek profits they believe they would have made from leverage; they seek the cost of replacing goodwill with tangible capital." 399 F.3d at 1355 n. 8.

Sixth, the government argues that the timing of the two sources of capital infusion in Professor Calomiris's model is "counter-factual" because the IPO proceeds are factored into the model prior to the retained earnings. Def.'s Br. at 70. However, Professor Calomiris analyzed whether the sequential timing of these two acts of mitigation was material in measuring the costs of capital, and he demonstrated it was not. Specifically, he observed that required returns on equity would have been higher in 1993, the date of the merger and the date of Syosset's contribution of its retained earnings to the merged institution, than in 1994, the date of the conversion. Tr. 2661:23 to 2662:3 (Test. of Calomiris). Moreover, in 1993 Long Island was more leveraged than it was in 1994, so its cost of equity capital would have been higher. Tr. 2662:4–19 (Test. of Calomiris); PX 778 (Demonstrative showing the relative net costs of retained earnings and IPO proceeds).

Lastly, the government surmises that Long Island would have converted regardless of the breach and would have written off its remaining goodwill, which write-off the government asserts would have been a condition imposed by the Securities Exchange Commission ("SEC") to regulatory approval of a conversion. Def.'s Br. at 70–71. Defendant's argument is speculative in that it hinges on a possibility that did not exist at the time of the breach. Indeed, the government's own description of SEC's regulatory authority indicates that SEC could have taken alternative courses of action. Def.'s Br. at 70. In the government's words, "the SEC would have required either that SFAS No. 72 be adopted, in which case nearly all of the goodwill would have been eliminated prior to conversion ..., or, at a minimum, the SEC would have required a reduction of the amortization period from 40 to 25 years." *Id.* at 70–71. In this respect, by the time of conversion, over ten years would have already

elapsed on Centereach's original 40–year amortization schedule. Moreover, apart from the SEC's uncertain posture, the government did not present evidence regarding what OTS could or would have done in relation to Long Island's goodwill in a non-breach circumstance. Finally, neither OTS nor the banks' investment bankers believed that the banks could have converted in the years immediately following the breach. Tr. 1081:24 to 1082:11 (Test. of Viklund). Conversion was a possibility that OTS urged the banks to consider on a continuous basis as the capital-plan period unfolded and as the banks' condition continued to improve. *See supra*, at 641.

e. *Computation of present value.*

 When awarding expectancy damages, a court must discount those damages that would have been incurred in the future to avoid unjustly enriching the plaintiff. *See Energy Capital II*, 302 F.3d at 1330; *see also Energy Capital Corp. v. United States*, 47 Fed.Cl. 382, 415 (2000) (*"Energy Capital I"*) (stating that the "value of a particular sum of money presently held is greater than the value of the same to be received in the future."). Damages are generally calculated and valued as of the date of the breach, except for expectancy damages that but for the breach would have been received in the future as part of a continuing contract. *Energy Capital II*, 302 F.3d at 1330. Future damages, *i.e.*, damages extending beyond the date of judgment, are addressed by applying a discount rate to obtain the present value of such damages as of the date of judgment. *Id.* ("Discounting future lost profits to the date of judgment merely converts future dollars to an equivalent amount in present dollars at the date of judgment; it is not an award of prejudgment interest and does not violate sovereign immunity."); *see also Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 634 F.2d 557, 564 (1980); *LaSalle Talman Bank, FSB v. United States*, 45 Fed.Cl. 64, 109 (1999). In this instance, Professor Calomiris applied these principles to discount the future-damages portion of the calculated cost of replacement capital to September 30, 2005. Tr. 5445:10–19 (Test. of Calomiris); PX 821; PX 821A Exs. E, F, H, I.

Determining the appropriate discount rate is a question of fact for the court. *Energy Capital II*, 302 F.3d at 1333. "[C]onservative investment instruments should be applied in making that determination. *Id.* Furthermore, although not required, the court may also take into account any potential future investment risks that plaintiffs might face, and adjust the discount rate accordingly." *See also id.* The court of appeals noted that it is appropriate to use a risk-free discount rate, such as the interest rate in treasury securities, when no evidence concerning a discount rate has been presented at trial. *Id.* In this case, Professor Calomiris explicitly used a discount rate of 9.04% based on the average annual dividend rate paid by Long Island to Long Island Bancorp from 1994 to 1998. PX 821A Exs. E, F, H, I. Faced with this evidence, the burden shifted to the government to produce countervailing credible evidence on the discount rate, and it failed to do so in this case. *See Energy Capital I*, 47 Fed Cl. at 419–20 (citing *Alma v. Manufacturers Hanover Trust Co.*, 684 F.2d 622, 626 (9th Cir.1982)).

Therefore, the court will discount the future cost-of-replacement-capital expectancy damages to the date of judgment, which the court will specify shall issue on September 30, 2005, at a rate of 9.06%. As of that date, the total cost of replacement capital amounts to $252,464,000.

2. *Lost profits.*

 Long Island also claims additional expectancy damages in the form of profits lost by plaintiffs as a consequence of a breach of contract. Pls.' Br. at 66–75. In this respect, the Federal Circuit has stated that "[t]he benefits that were expected from the contract, 'expectancy damages,' are often equated with lost profits, although they can include other damage elements as well." *Glendale Fed. Bank*, 239 F.3d at 1380 (Fed. Cir.2001) (citing *Restatement (Second) Contracts* § 347).

On plaintiffs' behalf, Dr. Nevins Baxter created a model to calculate the amount of profits lost due to the sale of deposit franchises, *i.e.*, deposits and branches. In creating his model, Dr. Baxter employed an eight-

step process to calculate the deposit-franchise damages. PX 702 (Demonstrative showing the methodology of Dr. Baxter). He began by measuring the size of the deposit losses caused by three distinct events. *Id.* First, in late 1992, multiple news stories publicized the potential for numerous bank failures in the United States, including that of Centereach, because they were classified as critically undercapitalized. PX 274 (Transcript of broadcast of NBC story (Nov. 10, 1992)); PX 280 (Newsday article entitled "TV Reports Panic LI Savings Corporation" (Nov. 13, 1992)); PX 286 (Money Magazine article indicating Centereach as one of 40 critically undercapitalized banks (Dec.1992)). Dr. Baxter noted that the bank suffered "significant deposit losses" during the same time period, PX 30 Revised (Summary of the banks' average monthly deposit balances (Apr.1994)), and he testified that the only logical explanation for the loss of deposits was the negative publicity. Tr. 2265:7 to 2266:16, 2269:15 to 2270:19 (Test. of Baxter).

The second event to which he pointed was the announcement of the sale of multiple branches to Home Savings. PX 309 (Joint press release announcing sale of branches (Apr. 29, 1993)). Dr. Baxter calculated the subsequent loss of deposits from the branches to be sold at approximately $114 million, PX 803 (Demonstrative of deposit runoff in the sold branches), and he opined that such losses were caused by customers' unease over the impending sale. Tr. 5498:10 to 5499:14 (Test. of Baxter). Dr. Baxter compared the decline in deposits at the ten branches to be sold to the other branches operated by the banks, concluding that the "non-sold branches suffered no losses and that the reduction in the deposits ... [subsequent to the sale announcement] was solely attributable to the sold branches." Tr. 5500:20 to 5502:16 (Test. of Baxter); PX 804 (Demonstrative showing the reduction in the bank's deposits).

Dr. Baxter's third event was the actual sale of branches to Home Savings, resulting in a transfer of approximately $836 million of deposits. Tr. 2270:19–20 (Test. of Baxter).

Dr. Baxter also examined the sale of earning assets belonging to both Syosset and Centereach. Tr. 2302:9–13 (Test. of Baxter).

From these starting points, Dr. Baxter sought to emulate what the banks would have gained had the deposit reductions not occurred and the assets not been sold. Tr. 2302:16 to 2303:24 (Test. of Baxter); PX 712 (Demonstrative showing deposits being hypothetically replaced). Dr. Baxter further included additional assets according to the banks' ratio of actual borrowings to deposits to reflect the growth, albeit limited, that the banks might have experienced had the sale of assets not occurred. Tr. 2305:1–24 (Test. of Baxter); PX 714 (Demonstrative showing actual average deposits and borrowings); PX 715 (Demonstrative calculating the earning assets for the bank in a non-breach scenario).

Dr. Baxter proceeded to compare the incremental and actual banks. Assuming that they would have had the same management and investment strategies, covered the same geographic area, and held the same type of assets, he opined that the incremental bank would have been "at least as profitable" as the actual bank. Tr. 2314:21 to 2316:24, Tr: 2325:19–21 (Test. of Baxter). He correspondingly multiplied the incremental banks' assets by the banks' actual Return on Average Assets ("ROAA"). Tr. 2325:25 to 2326:5 (Test. of Baxter). This calculation produced Dr. Baxter's postulated profits lost between fiscal years 1993 and 1998, totaling approximately $91 million. PX 720 (Demonstrative applying actual ROAA to incremental franchise assets). Finally, the premium that the banks received from the sale of the franchises was subtracted from these gross lost profits to leave approximately $78 million in lost-profit damages. *Id.*

The government vigorously contests any award of lost profits based upon Dr. Baxter's calculations. Def.'s Br. at 37–52. Among other things, the government contends that deposits were not lost due to adverse publicity but rather to disintermediation and other factors, *id.* at 41, that Dr. Baxter's opinion regarding loss of deposits after the announcement of the sale of branches is purely subjective because he did not conduct an event analysis or peer-group analysis to con-

firm his assumption, *id.* at 42, and that the sale of branches and attendant deposits was not caused by the breach. *Id.* at 38–40. The government also criticizes Dr. Baxter's model because it applies to bank-wide return on average assets rather than the return on the assets actually sold, *id.* at 44–47, and because he failed to take account of the gain of roughly $47.8 million realized on the assets that were sold. *Id.* at 47–48. In general, the government asserts that Dr. Baxter's model produces results that are too speculative and uncertain to be used as a basis for awarding expectancy damages. *Id.* at 44–49 (citing particularly *Wells Fargo Bank v. United States,* 88 F.3d 1012 (Fed.Cir.1996)).

Plaintiffs themselves place a caveat on Dr. Baxter's calculations of lost profits. They concede that if the court should award cost-of-replacement-capital damages as derived by Professor Calomiris for the period from September 1993 through September 1998, "then it would be unnecessary for the [c]ourt to reach the validity of deposit[-]franchise damages as calculated by Dr. Baxter." Pls.' Br. at 66. Because the court has found that expectancy damages in the form of the banks' costs of mitigation, *i.e.,* their costs of replacing the goodwill as capital, should be awarded without a carve-out of the period from September 1993 through September 1998, *see supra,* at 644–48, the court will apply plaintiffs' concession to forestall any award of lost profits in this case. Notably, the banks achieved a full mitigation of the government's breach by replacing all of Centereach's supervisory goodwill with tangible capital. Any additional award of expectancy damages would in essence constitute a windfall. Although it is true that the bank resulting from the mitigating transactions was $1 billion smaller than the banks before the breach, the difference in size does not by itself constitute a ground for awarding lost-profits damages in addition to the damages directly attributable to the banks' successful efforts at mitigation. Thus, it is unnecessary to consider the government's specific objections to Dr. Baxter's model.

### 3. *Reduced IPO proceeds.*

The banks have also sought to recover allegedly reduced IPO proceeds that they would have received but for the breach. Ronald Riggins, president of RP Financial, analyzed what Long Island's value would have been at conversion, absent a breach by the government. Pls.' Brief at 57. Mr. Riggins operated under the assumptions that the supervisory goodwill would have been retained by Long Island and the restructuring of the banks did not occur, but the Bulk Sale of assets would have been completed. Tr. 1720:4 to Tr. 1721:16 (Test. of Riggins); PX 426 ¶¶ 30, 37, 39–40, 42–43 (Riggins' report on Long Island's non-breach conversion valuation (Oct. 25, 1999)). With these assumptions, he opined that Long Island would have had an annual valuation-earnings base of $39.6 million, $9.2 million higher than in his original appraisal. PX 426 ¶ 42, Ex. 4.

In preparing his analysis, Mr. Riggins used financial data from Long Island as of August 31, 1993, with certain adjustments based on the aforementioned assumptions. Tr. 1726:11 to 1727:8, 1730:23 to 1732:8 (Test. of Riggins); PX 583 (Demonstrative of the financial data used for a non-breach appraisal). Mr. Riggins created, as in the original appraisal, a range of Long Island's value, with a midpoint, had a breach not occurred, of $300 million. Tr. 1750:4 to 1751:17 (Test. of Riggins); PX 590 (Demonstrative as to Long Island's non-breach appraisal range of value). Mr. Riggins also opined that Long Island's actual value, had it converted without the breach, would have been at the super-maximum, 15% above the maximum value, equaling $396.75 million. Tr. 1751:18–23 (Test. of Riggins); PX 426 ¶ 53. Therefore, Mr. Riggins asserted that without the breach, Long Island would have received an additional $97.4 million in IPO net proceeds.

Nevertheless, the plaintiffs should not be awarded any damages measured by reduced IPO proceeds. This measure in effect replicates, or serves as a surrogate for, damages premised upon the emergence of a smaller bank after the banks carried out their mitigating actions. An award based upon reduced IPO proceeds would be just as inappropriate and duplicative as would an award of lost profits.

#### 4. *Incidental losses.*

The banks seek incidental-expense damages in six categories that they claim they would not have incurred but for the breach of contract by the government. Termed "incidental losses" by the Restatement, plaintiffs are entitled to recover such losses insofar as "they protect the injured party's expectation interest but are separate and distinct from" the cost of replacement capital. *Globe Savings*, 65 Fed.Cl. at 361 (citing *Restatement (Second) Contracts* § 347 cmt. c).

##### a. *Excess deposit insurance costs.*

The banks first assert that as a result of the government's breach, Centereach paid excess deposit insurance premiums. Tr. 401:2–23 (Test. of Fuster); PX 31 at 2 (Excess Costs of Deposit Insurance (1999)). Prior to FIRREA, both Centereach and Syosset were rated equally with a composite rating of "2" under the MACRO system and paid the same premiums, *see* PX 35 (Demonstrative summarizing ratings for Syosset, Centereach, and Long Island Bancorp); PX 35A (supporting materials for PX 35), but afterwards Centereach's rating was reduced to a 4. PX 249 (Letter from Vigua to Nacos (March 25, 1992)). The banks claim that Centereach's lower rating after the breach caused it to incur higher deposit insurance payments to the FDIC's Savings Association Insurance Fund ("SAIF"). Pls.' Br. at 64. The premium Syosset paid during these periods was 0.115% compared to Centereach's rate of 0.155%. Using the rate paid by Syosset as the asserted rate that Centereach would have paid in a non-breach situation, and then calculating the excess premium that Centreach paid during this time period, plaintiffs claim that they suffered $1,912,600 in damages. PX 31A at PX031A–0001 to 0005 (FDIC's SAIF Certified Statements); *see also* PX 724 (Demonstrative showing schedule of SAIF premium rates).

The government asserts that such figures are speculative and that the banks have offered no proof that Centereach's overall risk assessment, and thus its insurance premium costs, would have been any different in a non-breach world. Def.'s Br. at 79. Specifi-cally, the government contends that the continued use of supervisory goodwill would simply have been "an accounting difference" and would not have been a "real change in Centereach's risk profile." *Id.*

The court finds the government's argument unavailing. The banks have proven that Centereach's risk assessment fell to a 4 because of "the institution's insolvent regulatory capital position" that was caused by the government's breach upon the passage of FIRREA. PX 249 (Letter from Vigna to Nacos (Mar. 25, 1992)). This drop in Centereach's MACRO rating was the direct cause of higher deposit insurance charges. Tr. 3202:13–18, 3213:6–9 (Test. of Stephen Rohrs, an Assistant District Director of OTS in New York during the pertinent time); Tr. 3247:17 to 3250:23 (Test. of John Robinson, an Assistant District Director of OTS for policy at the pertinent time); Tr. 3326:20–3327:3 (Test. of Michael Simone, Assistant District Director of OTS in New York at the pertinent time). Therefore, the banks' claim for excess deposit insurance costs is accepted as proven.

##### b. *Excess OTS examination costs.*

The banks also seek as incidental damages higher OTS examination costs that Centereach was required to pay in 1992 and 1993. Tr. 402:14 to 403:10 (Test of Fuster); PX 31 at 3. Centereach's poorer MACRO rating triggered the premium-assessment provision indicated in Thrift Bulletin 48 as Centereach was now considered a "troubled institution." PX 249 (Letter from Vigna to Nacos (March 25, 1992)) ("Because of the assigned MACRO rating, Centereach is considered a troubled institution and must pay the premium assessment as indicated in Thrift Bulletin 48."). Using the assessment schedule for Syosset, the banks calculated the excess examination costs by comparing what Centereach would have been charged had their MACRO rating remained equal to Syosset's versus their actual payments following the breach.

As with deposit insurance costs, the government again asserts that the figures offered by the banks are too uncertain to determine what, if any, excess examination costs Centereach might have paid. Def.'s Br. at 78–79. In particular, the government

argues that plaintiffs' calculations are founded on hypothetical activity of OTS; specifically, the belief that OTS would have still provided Centereach a MACRO rating of 2 if supervisory goodwill was available.

The court is persuaded by the evidence that Centereach paid excess OTS examination costs because of the breach by the government. During 1992 and 1993, Centereach paid $1,307,372 in examination costs to OTS, in contrast to Syosset, which paid $871,582 in examination fees assessed at the general rate as a result of its stronger MACRO rating. PX 31 at 3. The differing treatment is attributable solely to the disallowance of Centereach's goodwill as regulatory capital. Consequently, the banks are entitled to incidental losses measured by excess OTS examination costs of $435,790. *Id.;* PX 31A at PX031A–0007 to 0013, 0043 (OTS Assessments and the banks' data).

### c. *Capital-plan costs.*

The banks also claim as incidental losses the costs they incurred in the preparation and implementation of Centereach's capital plans. The banks seek expenses paid to four firms: KPMG Peat Marwick ("Peat Marwick"), Goldman Sachs, Simpson Thacher & Bartlett ("Simpson"), and Wilmer Cutler & Pickering ("Wilmer"). PX 31 at 4. The banks presented bills, invoices, and charges by these firms for work completed through September 1993 on the capital plans. *Id;* Tr: 404:16–21 (Test. of Fuster). In some instances, a vendor worked on matters other than the capital plans during a billing period, without separately breaking out the charges for services related to the plans. Tr. 406:1–6 (Test. of Fuster). In those instances, Mr. Fuster allocated 10% of the cost to capital-plan expenses. Tr. 405:4 to 406:8 (Test. of Fuster). The government has countered that some of the allocations made by Mr. Fuster were "arbitrary, and unreliable." Def's. Br. at 78. In his testimony, Mr. Fuster admitted that he could not recall exactly what portion of the expenses were attributable to the capital plans and that his allocations were based purely on his own judgment. Tr. 471:13 to 492:5 (Test. of Fuster).

The court finds that those claimed expenses derived by Mr. Fuster's allocations have not been proven to a reasonable certainty. Therefore, in calculating the incidental losses attributable to work on the capital plans, the court excludes $64,031 attributed to Simpson. DX 4002 (Simpson bill # 1 (Mar. 28, 1990)); DX 4003 (Simpson bill # 2 (May 18, 1990)); DX 4004 (Simpson bill # 3 (Nov. 13, 1990)); DX 4005 (Simpson bill # 4 (Apr. 17, 1991)); DX 4006 (Simpson bill # 5 (Sept. 18, 1991)); DX 4007 (Simpson bill # 6 (Mar. 30, 1992)); PX 32A, tab 38 at PX032A–0250 to 253. For the same reasons, the court excludes $4,814 allocated from bills rendered by Wilmer, DX 4029 (Summary of transaction costs paid to Wilmer); PX 32A, tab 42 at PX 032A–0281, 282, 286, along with a further $6,099 paid to Wilmer on the ground that bills rendered by Wilmer dated April 30, 1990 and May 14, 1990 are duplicative. DX 4009 (Wilmer bill # 2 (Apr. 30, 1990)); DX 4010 (Wilmer bill # 3 (May 14, 1990)).

However, the court finds that $17,664 paid by the banks to Wilmer in early 1990 should have been classified as part of the work on the capital plans rather than being attributed to merger expenses. DX 4008 (Wilmer bill # 1 (Jan. 2, 1990)); *see* Tr. 492:6 to 495:3 (Test. of Fuster). Consequently, this payment is included as an incidental loss relating to work on the capital plans instead of merger expenses.

As a result, the court determines that the banks paid fees, expenses, and charges attributable to preparation and implementation of Centereach's capital plans as follows: $200,738 to Goldman Sachs for capital-plan costs from 1990 to 1991, PX 32 at 4; PX 32A, tab 16 (Capital plan costs paid to Goldman Sachs); $46,550 to Peat Marwick for similar expenses incurred in 1993, DX 4000 (Peat Marwick bill # 1 (Jan. 7, 1993)); DX 4001 (Peat Marwick bill # 2 (Aug. 30, 1993)); $67,568 to Simpson for such expenses, PX 32A, tab 38 at PX032A–0232 to 237, 256–257; and $256,145 to Wilmer in fees and charges for work pertaining to the capital plans. Tr. 405:4 to 406:13 (Test. of Fuster); DX 4008; DX 4009; DX 4011 (Wilmer bill # 4 (Apr. 5, 1993)); DX 4012 (Wilmer bill # 5 (Apr. 28, 1993)); DX 4013 (Wilmer bill # 6 (Aug. 5, 1993)); DX 4014 (Wilmer bill # 7 (Aug. 30, 1993)); DX 4015 (Wilmer bill # 8 (Oct. 1,

1993)); DX 4016 (Wilmer bill # 9 (Nov. 30, 1993)); PX 32A, tab 42 at PX 032A–0279 to 280, 284, 289. Therefore, the court awards $571,001 to the banks in damages for incidental losses attributed to capital-plan expenses.

d. *Branch and associated asset-sale costs.*

Mr. Fuster also testified as to losses the banks incurred as a result of three matters relating to the sale of branches and assets in 1993 and 1994: the sale of HELOCs, the sale of branches, and the sale of some secured mortgages. Tr. 406:14–25 (Test. of Fuster). In total, the banks incurred costs of $5,106,503 on the three sales through payments to a variety of vendors. PX 31 at 5. This is the sole claim for damages that is not disputed by the government. The government disputes only the banks's payment of approximately $1.9 million payment to Capital Markets Assurances Corporation for the purpose of insuring the package of HELOCs that was offered to purchasers. Def.'s Br. at 76. However, the government has not met its burden of proving that the insurance of the HELOCs package was an unreasonable mitigating step by the banks. *See Long Island,* 60 Fed.Cl. at 90. The government does not contest that the provision of insurance was useful. The insurance enhanced the market for the securitized package of HELOCs and it added to the net receipts on the sale by the banks. Tr. 5080:2 to 5081:7, 5373:13 to 5375:8 (Test. of Dr. Carron). Its objection instead seems to be that the benefits should be credited, that the benefits presumably exceeded the costs, and that as a result the item should simply be excluded. Tr. 5374:1–15 (Test. of Carron). That same overarching contention could be made for any of the costs of taking the mitigating steps because, overall, the banks' efforts at mitigation were successful even though costs were incurred in the process. Moreover, regarding the particular transaction, the evidence in the record is insufficient for the type of detailed parsing sought by the government. Thus, the court awards $5,106,503 to the plaintiffs for incidental losses incurred pursuant to the costs from the sales of branches and assets.

e. *Conversion expenses.*

The banks also seek recovery of the expenses incurred to convert to a stock company. Mr. Fuster testified that in most instances, the banks could not retrieve the actual bills from vendors for aiding in the conversion. Tr. 410:1 to 411:6 (Test. of Fuster). As a result, while bills were provided for some companies, the majority of charges were derived from a report made for a 1993 IRS audit. Tr. 410:1–8 (Test. of Fuster); DX 4018 (Report prepared for 1993 IRS audit (June 30, 1994)). The government urges the court to find a lack of reasonable certainty in this calculation of conversion expenses damages on the ground that "many of the costs ... were compiled ... by an accounting firm ... from a document ... purportedly for an" IRS audit. Def.'s Br. at 77.

Based on the evidence, the court agrees with the banks in part and the government in part. Helpfully, Mr. Fuster's calculations of conversion expenses are similar to Dr. Carron's, the government's expert witness. *See* Tr. 5127:5–16 (Test. of Carron); DX 3147 (Demonstrative of the banks' conversion details, including expenses of $11,437,461). The banks initially sought $11,596,975 as incidental expenses related to the conversion. *See* PX 32 (Summary of expenses related to conversion). Of this initial claim, the court allows the following expenses related to the conversion, listed on an item-by-item basis: (1) $7,224 paid to American Banknote for production of stock certificates, *see* DX 4017; PX 32; PX 32B, tab 2;[26] Tr. 408:22 to 409:9

**26.** Plaintiffs' Exhibits 31A, 32A, and 32B were identified at trial as volumes of exhibits containing detailed documentary materials supporting the summaries that were admitted into evidence as PX 31 and PX 32 under Fed.R.Evid. 1006. *See* Tr. 397:12 to 399:8 (Test. of Fuster). The volumes of documentary materials identified as PX 31A, PX 32A, and PX 32B were used by counsel and the witnesses during direct examination and cross examination at the trial in addressing particular elements of the cost summaries.

PX 32, PX 32A, and PX 32B relate specifically to conversion expenses. The government puts these exhibits in issue by arguing in its post-trial brief that the admission of PX 32 should be revisited and that this exhibit now should be elided from the record because that summary was compiled from unreliable sources and reflects subjective allocations of expenses within

and 502:5 to 503:8 (Test. of Fuster), (2) $602,838 paid to Chemical Securities and Trust Services, see PX 32; PX 32B, tab 8, (3) $33,279 paid to Duff & Phelps, see PX 32; PX 32B, tab 12, (4) $325,601 paid to KPMG Peat Marwick, see PX 32; PX 32B, tab 19 at PX 032B–054 to 55, 58, 59, 78–80, 84, 87–97; Tr. 409:10–23 (Test. of Fuster), (5) $195,130 paid to Mark Services Inc., see PX 32; PX 32B, tab 20; Tr. 410:1–14, 514:23 to 515:9 (Test. of Fuster), (6) $3,006,620 paid to Merrill Lynch Co., see PX 32; PX 32B, tab 22, (7) $1,261,282 paid to Milbank Tweed, see PX 32; PX 32B, tab 23; Tr. 412:22 to 413:12, 526:13

to 539:10 (Test. of Fuster),[27] (8) $5,199 paid to Morris, Nichols, Arsht & Tunnell, see PX 32; PX 32B, tab 25, (9) $50,000 paid to NASDAQ, see PX 32; PX 32B, tab 28; (10) $20,000 paid to OTS, see PX 32; PX 32B, tab 29, (11) $107,601 paid to RP Financial, see PX 32; PX 32B, tab 33; Tr. 410:15–19 (Test. of Fuster), (12) $1,350,000 paid to R.R. Donnelly, see PX 32; PX 32B, tab 34; Tr. 524:1 to 526:12, 567:7 to 568:25 (Test. of Fuster), (13) $2,606,620 paid to Salomon Brothers, see PX 32; PX 32B, tab 35, and (14) $131,588 paid to the SEC, see PX 32; PX 32B, tab 36. Thus, the court finds that the banks incurred

categories. See Def.'s Br. at 77–78 (citing *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998)). The court declines this invitation. PX 32 was admitted into evidence at trial only after extensive, detailed examination of Mr. Fuster about its genesis and the underlying factual support for it. See Tr. 589:20 to 590:7 (ruling of the court regarding admissibility of PX 32). See also Tr. 499:19 to 597:23 (cross-examination and argument about the documents underlying PX 32, which documents included DX 4017, which was admitted for limited purposes as a demonstrative, and DX 4018 through 4030, which were admitted for all purposes).

Moreover, contrary to the government's argument, the Sixth Circuit's ruling in *Bray* actually supports the court's decision at trial to admit the summaries as evidence under Fed.R.Evid. 1006. There, as here, the trial court admitted summaries as evidence only after the elements for admissibility under Rule 1006 had been established at trial, namely:

the summarized writings must be so voluminous so as to be unable to be conveniently examined in court[;] ... the underlying evidence must itself be admissible[;] ... the original or copies of the summarized writings must be made available to the opposing party [;] ... [a]nd ... the proposed summary (or chart or calculation) must accurately summarize (or reflect) the underlying document(s) and only the underlying document(s).

*Bannum, Inc. v. United States*, 59 Fed.Cl. 241, 244–45 (quoting *Bath Iron Works Corp. v. United States*, 34 Fed.Cl. 218, 232–35 (1995), aff'd, 98 F.3d 1357 (Fed.Cir.1996)).

In admitting PX 31 and PX 32 as summaries, the court warned the parties that it would examine the detailed documents making up these summaries in deciding the incidental-loss aspect of the case:

[THE COURT:] Plaintiffs' Exhibit 31 is admitted. (The document referred to, previously identified as Plaintiff's Exhibit No. PX 31, was received in evidence.)

... When I say it's admitted, it's admitted for evidentiary purposes. This is not to say that the Court is going to accept every factual inference that Mr. Fuster drew from the partic-

ular data that were made available. And the Court wants to draw that distinction quite strongly, because the Court might well, in the end, in its findings of fact, draw different inferences and reach a different result.

Now let's turn to Plaintiffs' Exhibit 32. This also is admitted as a summary under Rule 1006. Again, this particular exhibit contains or reflects some data directly taken from documents that either are in evidence or otherwise were provided to Defendant as a result of and in the process of discovery. It contains mathematical calculations and reflects other judgments by Mr. Fuster and indeed perhaps some others.

While the Court admits the document, the Court does not necessarily, by admitting it, indicate in any way that it is inclined to accept all of the inferences that are spelled out or underlie or are embedded in that particular summary.

Tr. 589:7 to 590:7. Given the government's argument in its post-trial brief, the court's above-quoted warning during trial, and the court's subsequent action in reviewing the documents underlying the summaries, the court now incorporates the volumes of documents identified as PX 31A, PX 32A, and PX 32B into the record as demonstrative, or pedagogical, material that serves to render the summaries and the testimony of witnesses at trial more understandable. See *Bannum*, 59 Fed.Cl. at 245 nn. 8–9 (citing Fed.R.Evid. 611(a) and *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir.2000)).

27. Milbank Tweed billed the banks, and the banks paid, fees and charges considerably in excess of this amount during the period from October 1993 through May 1994. However, the court has allowed only those fees and charges by Milbank Tweed that that firm specifically identified as being solely attributable to the conversion. Consequently, the court has allowed only $591,204 from a bill rendered Feb. 15, 1994, $418,338 from a bill rendered March 30, 1994, and $251,740 from a bill rendered June 14, 1994. See PX 32B, tab 23, at PX 032B–0120, 0135, 0139, and 0153.

$9,702,982 in incidental losses related to the conversion.

In that regard, as the summation provided above shows, the court has examined the testimony at trial about the underlying documentation and has also evaluated that documentation to make determinations of fact that eliminate speculative inferences and unsupported elements of expense from plaintiffs' claimed incidental losses related to the conversion.

### f. *Merger expenses.*

Lastly, the banks claim $57,764 in incidental losses related to the merger. *See* Tr. 407:21 to 408:13 (Test. of Fuster); PX 33 (Summary of expenses related to merger). The banks established at trial that they paid $29,700 in merger expenses to Peat Marwick, PX33; PX 32B, tab 19 at PX032B–0069, 71, 102,[28] and $10,400 to OTS in connection with the banks' merger application. *See* PX 33; PX 32B, tab 29, at PX32B–0222 to 225. Thus, the court finds that plaintiffs are entitled to $40,100 in incidental losses caused by merger expenses.

### g. *Synopsis of incidental losses.*

The total allowed incidental losses amount to (a) $1,912,600 in excess deposit insurance (SAIF) costs, (b) $435,790 in excess OTS examination costs, (c) $571,001 in capital-plan costs, (d) $5,106,503 in branch and associated asset-sale costs, (e) $9,702,982 in conversion expenses, and (f) $40,100 in merger expenses, for a total of $17,768,976, which rounds to $17,769,000.

### 5. *Tax gross-up.*

■ The banks request the court to award damages on a pre-tax basis, *i.e.*, to apply a "tax gross-up," to put the plaintiffs in the same position as if the breach had never occurred. Pls.' Br. at 62. The Federal Circuit has stated that "a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Savings IV,* 399 F.3d at 1356 (citing *Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991); and *First Nation-*

*wide Bank v. United States,* 56 Fed.Cl. 438, 449 (2003)); *see also LaSalle Talman,* 64 Fed.Cl. at 114. In this respect, some trial courts have called upon a plaintiff seeking such a gross-up to "show with reasonable certainty that the gross-up is necessary to make plaintiff whole, [that] the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate." *Citizens Fed. Bank, FSB v. United States,* 59 Fed.Cl. 507, 521 (2004). The government contests plaintiffs' request, arguing that some courts have decided not to award a tax gross-up. Def.'s Br. at 81. In most such instances, trial courts found that the plaintiff failed to satisfy its burden of establishing to a reasonable certainty the need for a gross-up. *See Citizens Fed.,* 59 Fed.Cl. at 523 ("Plaintiffs are not entitled to [a tax] gross-up ... because they cannot meet their burden with reasonable certainty."); *Bank of Am. v. United States,* 67 Fed.Cl. 577, 597 (2005), 2005 WL 1792182, at *19 (2005)(applying the same logic as in *Citizens Federal*).

■ Separately, the government contends that a tax gross-up is not appropriate because the party who would receive the benefit, Astoria Financial, is not a party to the suit. Def.'s Br. at 81. Such an argument is without merit. The Federal Circuit, in *Home Savings IV,* ordered a tax gross-up despite the fact that ultimately the gross income to be taxed would be that of the plaintiffs' parent company, Washington Mutual, due to the filing of consolidated tax returns. 399 F.3d at 1356. Correspondingly here, the income to be taxed would be that of the Astoria set of entities that are the successors of Bancorp and Long Island. The government's party-related argument is accordingly unavailing.

There is reasonable certainty that a damages award for the cost of replacement capital would be necessary to make plaintiffs whole because the Federal Circuit has held that such an award compensates a plaintiff for "lost monies that would not have been

---

**28.** A clerical error in plaintiffs' documentation does not affect the court's determinations. Both PX 32A; tab 19 at PX032A–0088 and PX 32B, tab 19 at PX032B–0050 classify (incorrectly) a $12,500 charge from an invoice rendered by Peat Marwick as a Home Saving Sale, or branch-sale, expense. This amount should be included in the merger category of expense.

taxable [i.e. the goodwill]." *Home Savings IV,* 399 F.3d at 1356; *see also* I.R.C. § 118 (2005) (noting that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.").

The banks have also satisfied their burden of proving to a reasonable certainty that an actual damages award for the cost of replacement capital would be taxable. "[A]ll income" regardless of its source is taxable as gross income "unless excluded by law." Treas. Reg. § 1.61–1(a); *see* I.R.C. § 61(a). Without any law specifying or indicating otherwise, the banks have satisfied their burden that damages, once awarded for cost of replacement capital, would be taxable. *See Home Savings IV,* 399 F.3d at 1356; *LaSalle Talman,* 64 Fed Cl. at 116. Although there is a possibility that an award of this type would not be taxed, it is "not a high one" in light of the expansive language of gross income's definition under I.R.C. § 61. *See LaSalle Talman,* 64 Fed Cl. at 116. The only type of damages award specifically excluded from gross income is one derived from a personal injury suit. *See* I.R.C. § 104(a)(2); *see also United States v. Burke,* 504 U.S. 229, 233, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992). Therefore, it is reasonably certain that an award for cost of replacement capital would be taxed.

Finally, the banks point to evidence that a 39.6% tax rate is the most appropriate for a gross-up based on the likely tax rate for Astoria in 2004 through 2006. Tr. 1884:5 to 1885:1, *see* 5183:12–16 (Test. of DiConstanzo, Astoria's tax director).[29] Mr. DiConstanzo testified that Astoria's marginal tax rate for 2004 will be 39.6% and that the same figure is being budgeted for 2005 and 2006. Tr. 1884:5 to 1885:1 (Test. of DiConstanzo); *see also* DX 1959 (calculation of Astoria's marginal tax rate). The government argues that this tax rate for Astoria might not apply in the future because Astoria might be subject to the alternative minimum tax, and thus any projection from the plaintiffs is speculative at best. Def.'s Br. at 83–84. However, the court accepts Mr. DiConstanzo's testimony as establishing Astoria's marginal tax rate to

a reasonable certainty. *See also LaSalle Talman,* 64 Fed Cl. at 118 (rejecting the argument that an alternative minimum tax renders a tax-rate projection speculative). In particular, Mr. DiConstanzo testified specifically that Astoria was not subject to tax under the alternative minimum tax provisions in 2004 and was not expected to be taxed under that regime in 2005. Tr. 5183:12–16 (Test. of DiConstanzo).

In light of this evidence, the court will provide a tax gross-up to the award of damages for the cost of replacement capital at a marginal tax rate of 39.6%. The tax gross-up effectively adds $165.522 million to the award of damages. In essence, this aspect of the court's decision will require the government to pay this additional amount with one hand and take a like amount back with the other hand in the form of Astoria's tax payments for the year Astoria receives the award. If these predicted events do not actually occur, the court will be receptive to a motion under RCFC 60(b) to reopen the judgment in this case to rectify any anomaly.

## CONCLUSION

Plaintiffs established at trial that the government entered into a contract with them providing for the recognition of goodwill, the use of push-down accounting, the treatment of goodwill as regulatory capital, and the amortization of goodwill over a forty-year period. This contract was breached by the government upon the enactment of FIRREA and the adoption of implementing regulations, and plaintiffs suffered loss as a consequence of that breach. The government is thus liable to plaintiffs for breach of contract.

The banks also proved damages at trial, measured by expectancy damages in the form of the cost of replacement capital plaintiffs incurred in mitigating the breach. On a basis that adjusts the post-judgment portion of these damages for present value, such damages amount to $252,464,000. The banks also established their entitlement to incidental losses under *Restatement (Second) Contracts* § 347. Those losses amount to $17,769,000. The court also awards plaintiffs

---

**29.** Mr. DiConstanzo has served as Astoria's tax director since 1998, and he is responsible for the

company's tax compliance, reporting, and planning. Tr. 1883:2–17 (Test. of DiConstanzo).

a tax gross-up for the portion of the award that consists of the cost of replacement capital, adding $165,522,000 to the award. No damages are awarded for lost profits or for reduced IPO proceeds on the conversion.

On September 30, 2005, the clerk shall enter final judgment in favor of plaintiffs, and both of them, in the amount of $435,755,000.[30] No costs.

IT IS SO ORDERED.

---

**30.** Final judgment for plaintiffs shall be entered on September 30, 2005, because that was the date used to calculate the present value of future damages. *See supra,* at 645. This decision is being rendered before, but sufficiently near in time to, that date such that preparation of a revised computation of present values using a slightly different date seems highly inefficient and unnecessary.